Lois J. WAGNER, Robin G. Wagner and Wende L. Wagner, Individually and as Wrongful Death Beneficiaries of Robert Wagner, Appellant–Respondent,

v.

BONDEX INTERNATIONAL, INC., and Simpson Timber Company, Respondent–Appellant,

Conwed Corporation, Defendant.

Nos. WD 72474, WD 72482, WD 72619.

Missouri Court of Appeals, Western District.

June 19, 2012.

342

Brent Rosenthal, for Appellant–Respondent.

Kyle Roehler, for Respondent–Appellant Bondex International, Inc.

Mark Arnold, for Respondent–Appellant Simpson Timber Company.

Clayton Dickey, for Conwed Corporation.

Before Division Four: LISA WHITE HARDWICK, Chief Judge, Presiding, JOSEPH M. ELLIS, Judge and VICTOR C. HOWARD, Judge.

JOSEPH M. ELLIS, Judge.

Bondex International, Inc. and Simpson Timber Company appeal from a judgment of the Circuit Court of Clay County entered in favor of Lois, Robin, and Wende Wagner, the wrongful death beneficiaries of Robert Wagner, in the amount $4.5 million. Lois, Robin, and Wende Wagner cross-appeal that same judgment being reduced by $900,000.00 pursuant to § 537.060.[1] For the following reasons, the judgment is affirmed in part and reversed and remanded in part.

In 2006, Robert Wagner was diagnosed with mesothelioma, a cancer that affects the pleural lining of the lungs. During the 1960s and 1970s, Wagner worked as a carpenter installing ceiling tile at project sites in the Kansas City area. Wagner worked primarily for two companies during that time period, Kansas City Natural Slate and United Acoustics. In 2007, Wagner died from mesothelioma, and his wife and children ("Plaintiffs") brought this wrongful death action. Plaintiffs claimed that Wagner's mesothelioma resulted from exposure to the asbestos-containing products manufactured by Bondex and Simpson Timber ("Defendants").

Bondex manufactured a joint compound that was commonly used on construction sites during the installation of drywall. From 1961 to 1977, Bondex joint compound contained asbestos.

Simpson Timber manufactured ceiling tiles. During the 1960s, Simpson Timber manufactured both asbestos-containing ceiling tile and non-asbestos-containing ceiling tile. Simpson Timber also purchased and resold ceiling tile from Conwed that contained asbestos.

At trial, several of Wagner's co-workers from Kansas City Natural Slate and United Acoustics testified about the ceiling tile installation process and the conditions carpenters typically encountered while installing ceiling tile. The co-workers also testified about the products they used or came in contact with at the various work sites in which they installed ceiling tile with Wagner.

William R. Harris, who worked with Wagner at Kansas City Natural Slate and

---

1. All statutory citations are to RSMo 2000 unless otherwise noted.

United Acoustics, testified that he and Wagner often installed ceiling tile while other individuals called "tapers" mixed, applied, and sanded joint compound in the same area. He further testified that the dust fell like snow "all the time" when they worked in close proximity to the tapers, stating you "couldn't get away from [the joint compound]" when it was being sanded. Harris also stated that he recalls Wagner being around while Bondex was being sanded and could remember Bondex joint compound being used at the Shawnee Mission South High School and Commerce Tower work sites. Harris also indicated that removing ceiling tile from its packaging and cutting it to fit the ceiling tile grid generated dust to the extent that it got into his hair and nose and covered his clothing. Harris recalled dropping Simpson Timber ceiling tile with Wagner. He could not remember, however, the specific job sites at which he and Wagner installed Simpson Timber ceiling tile.

Chester McGuire, who also worked at Kansas City Natural Slate, testified that it was common for ceiling tile workers to be present while tapers used and sanded joint compound, which would create dust that he and Wagner would have inhaled. McGuire further testified that he remembers Bondex joint compound being used in the 1960s on sites at which he and Wagner worked, specifically Shawnee Mission South High School and the Hallmark facilities project. McGuire also stated that he and Wagner cut and dropped ceiling tile manufactured by Simpson Timber during the 1960s at the Shawnee Mission South High School and Hallmark work sites. McGuire, however, was unable to recall if the Simpson Timber tiles used at those work sites contained asbestos.

Fred Divelbliss, a former Kansas City Natural Slate worker, also testified that he recalled Wagner working with Simpson Timber ceiling tiles. He was unable to remember if those tiles contained asbestos.

William Jay Harris, another Kansas City Natural Slate worker, testified that he believed they would have worked with Simpson Timber tiles at some point in the Kansas City area. Harris could not remember the specific Simpson Timber products used or whether the tiles used contained asbestos.

Two experts also testified on Plaintiffs' behalf, Dr. Arnold Brody and Dr. John Maddox. Dr. Brody's testimony consisted primarily of background information regarding asbestos and how mesothelioma develops. Dr. Brody testified that asbestos is the only known environmental cause of mesothelioma. He went on to explain that mesothelioma is a cancer that results from the accumulation of asbestos fibers in the pleural lining of the lungs that ultimately causes genetic errors in mesothelial cells. He explained it is the cumulative effect of a person's exposure to asbestos fibers and the subsequent genetic errors that cause mesothelioma. He further testified that it is impossible to identify the specific asbestos fiber that begins or causes the mesothelioma development process.

Dr. Maddox also testified that mesothelioma results from an individual's cumulative exposures to asbestos and that exposure to all types of asbestos above ambient, background levels can result in mesothelioma. Dr. Maddox was then asked a series of hypotheticals by Plaintiffs' counsel. Each hypothetical posited the specific asbestos qualities of each Defendant's respective asbestos-containing product and questioned whether a product containing such amounts of asbestos contributed to Wagner developing mesothelioma. To each hypothetical, Dr. Maddox answered that he believed, with a reasonable degree of medical certainty,

that each Defendant's product was a substantial, contributing factor in the development of Wagner's mesothelioma and his subsequent death therefrom.

Prior to the case being submitted to the jury, Defendants each filed a motion for directed verdict. Those motions were denied except for Bondex's motion for directed verdict with respect to the issue of aggravated circumstances damages. On June 3, 2009, the jury returned a verdict in favor of Plaintiffs in the amount of $4.5 million. The jury apportioned fault as follows: 20% to Bondex, 35% to Simpson Timber, and 45% to Conwed Corporation.[2]

Following the verdict, each Defendant also filed a motion to delay the entry of judgment. Defendants' motions sought to delay the entry of judgment until Plaintiffs had made claims to bankruptcy trusts established by several bankrupt manufacturers of asbestos products to pay personal injury claims. These manufacturers were not named in the lawsuit. Defendants' motions also sought to reduce the judgment by other settlement agreements they believed Plaintiffs had already entered into or received. Defendants presented evidence that Plaintiffs had entered into a settlement agreement with the T.H. Agriculture & Nutrition, L.L.C. ("THAN") personal injury bankruptcy trust for $900,000.00. THAN was originally included in the lawsuit but was removed when the manufacturer filed for bankruptcy. On July 7, 2009, the trial court entered its Judgment and Order reducing the judgment by the following amounts: (1) $525,000.00 for settlements agreed to and received by Plaintiffs and (2) $900,000.00 for a settlement agreed to and stipulated

between Plaintiffs and THAN. Defendants each then filed motions for judgment notwithstanding the verdict ("JNOV"). All JNOV motions were denied.

Following the trial court's judgment, the parties appealed the judgment to this court. The appeal was dismissed, however, because the trial court did not address the remaining John Doe defendants named in the suit. Plaintiffs filed a motion to dismiss the John Doe defendants with prejudice. At that time, Plaintiffs also filed a motion to dismiss and for entry of amended judgment arguing that the settlement agreement between Plaintiffs and the THAN bankruptcy trust was deemed nonexistent by a federal bankruptcy court.

On May 25, 2010, the trial court entered its Order and Final Judgment, which dismissed the John Doe defendants, with prejudice. In that judgment, the court also reduced the verdict by the amount of $525,000.00 for the settlements Plaintiffs had agreed to and received and the $900,000.00 settlement agreement the court found existed between Plaintiffs and the THAN bankruptcy trust. Thus, the judgment for Plaintiffs was reduced by $1,425,000.00.

Both Defendants and Plaintiffs appeal from the judgment. Bondex brings five points on appeal, while Simpson Timber presents three points. Plaintiffs have one sole point on cross-appeal. Bondex's first two points, as well as Simpson Timber's first two points, generally assert the trial court erred in denying their motions for directed verdict and judgment notwithstanding the verdict because Plaintiffs failed to make a submissible case in that they failed to prove that either defendants'

---

**2.** Conwed Corporation was another manufacturer of ceiling tile and was a named defendant in the action. Conwed appealed the judgment, filed briefs and participated in oral argument. After submission, Conwed and

Plaintiffs jointly moved to dismiss Conwed's appeal and Plaintiffs' cross-appeal against Conwed. This Court entered its order sustaining the joint motion, and the appeal and cross-appeal were dismissed on May 16, 2012.

products caused Mr. Wagner's mesothelioma. Therefore, we first address whether Plaintiffs made a submissible case.

■■■ "The standard of review for the denial of a judgment notwithstanding the verdict is essentially the same as that for the overruling of a motion for directed verdict." *Montgomery v. Wilson*, 331 S.W.3d 332, 335–36 (Mo.App. W.D.2011). "A motion for judgment notwithstanding the verdict should be sustained only when all of the evidence and the reasonable inferences to be drawn therefrom are so strong against the plaintiff's case that there is no room for reasonable minds to differ." *Poloski v. Wal–Mart Stores, Inc.*, 68 S.W.3d 445, 448 (Mo.App. W.D.2001). "To survive either a motion for directed verdict or a motion for judgment notwithstanding the verdict, the plaintiff must have made a submissible case." *Montgomery*, 331 S.W.3d at 335. "Whether the plaintiff made a submissible case is a question of law subject to *de novo* review." *Moore v. Ford Motor Co.*, 332 S.W.3d 749, 756 (Mo. banc 2011) (internal quotation omitted) (italics added).

■■■ "To make a submissible case, the non-moving party must present substantial evidence establishing each element of the claim." *Livingston v. Baxter Health Care Corp.*, 313 S.W.3d 717, 724 (Mo.App. W.D. 2010). "Substantial evidence is competent evidence from which the trier of fact can reasonably decide the case." *Id.* (internal quotation omitted). "Whether evidence is substantial and whether any inferences drawn are reasonable is a question of law." *Poloski*, 68 S.W.3d at 449. "We will not overturn a jury's verdict unless there is a complete absence of probative facts to support it." *Id.* In determining whether a submissible case was made, "[e]vidence is viewed in the light most favorable to the jury's verdict, giving the plaintiff all reasonable inferences and disregarding all conflicting evidence and inferences." *Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 95 (Mo. banc 2010). "We do not, however, supply missing evidence or give the plaintiff the benefit of unreasonable, speculative, or forced inferences." *Poloski*, 68 S.W.3d at 449.

■■■ Bondex and Simpson Timber attack the submissibility of Plaintiffs' case by asserting that Plaintiffs failed to prove causation. As in any other tort case, Plaintiffs were required to prove that each defendant's conduct was an actual cause, that is a cause in fact, of the injury or event of which they complain. *City of St. Louis v. Benjamin Moore & Co.*, 226 S.W.3d 110, 113 (Mo. banc 2007). "Mere logic and common sense dictates that there be some causal relationship between the defendant's conduct and the injury or event for which damages are sought." *Callahan v. Cardinal Glennon Hospital*, 863 S.W.2d 852, 862 (Mo. banc 1993). "Once actual causation has been established, the issue becomes one of legal cause—also known as proximate cause—that is, whether the defendant should be held liable because the harm is the reasonable and probable consequence of the defendant's conduct." *Benjamin Moore*, 226 S.W.3d at 114.

The parties argue at some length regarding whether the "but for" test or the "substantial factor" test for causation is applicable. These arguments suggest some confusion regarding these "tests." Plaintiffs rely on *Hagen v. Celotex Corp.*, 816 S.W.2d 667, 670 (Mo. banc 1991), where the Court stated that in order to recover from manufacturers in a wrongful death action, plaintiffs "must establish that that [manufacturer's] products directly contributed to the death." *Id.* at 670. It further clarified that "[t]his requires evidence that the product of each [manufacturer] sought to be held liable was a 'sub-

stantial factor' in causing the harm." *Id.* (citing *Jackson v. Ray Kruse Const. Co.,* 708 S.W.2d 664, 669 (Mo. banc 1986)). Based on *Hagen,* Plaintiffs argue that the "substantial factor" test applies in this case.

Bondex and Simpson Timber, on the other hand, point to *Callahan v. Cardinal Glennon Hospital,* 863 S.W.2d 852, 861 (Mo. banc 1993), to support their contention that the "but for" test is applicable. In *Callahan,* the Court stated that " '[b]ut for' is an absolute minimum for causation because it is merely causation in fact," and that "[a]ny attempt to find liability absent actual causation is an attempt to connect the defendant with an injury or event that the defendant has nothing to do with." *Id.* at 862.

In specifically addressing "but for" causation in the context of multiple tortfeasors, the Court emphasizes that "there is nothing inconsistent or different about applying a 'but for' causation test to a circumstance involving multiple tortfeasors." *Id.* Thus, the Court held that, under Missouri law, "the 'but for' test for causation is applicable in all cases except those involving two independent torts, either of which is sufficient in and of itself to cause the injury, i.e. the 'two fires' cases." *Id.* at 862–63. "Two fires" cases involve situations in which "there are two independent torts, either of which by itself would have caused the injury."[3] *Id.* at 861. Because

the "but for" causation test fails to accurately test for causation in these situations, the substantial factor test becomes the means of establishing actual causation in "two fires" cases. *Id.*

■ While Plaintiffs are correct that *Callahan* does not expressly overrule *Hagen, Callahan* does set forth how to establish actual causation under Missouri law by clearly mandating that the "but for" causation test must be satisfied in all cases, including circumstances involving multiple tortfeasors, unless the facts of the case are such that the situation should be treated as a "two-fires" case. *Id.* at 861–63. Moreover, the Court expressly stated that "[t]o the extent that *Jackson v. Ray Kruse [Const. Co.,* 708 S.W.2d 664, 669 (Mo. banc 1986) ] and the cases discussed therein are contrary, they are overruled. And *Hagen,* of course, relied on *Jackson.*"

Since *Callahan,* Missouri appellate courts have repeatedly declared that "but for" causation is applicable in all tort cases except two fires cases. *See e.g., Benjamin Moore,* 226 S.W.3d at 114 ("In most cases, the plaintiff must establish actual causation by showing that the alleged harm would not have occurred "but for" the defendant's conduct. The only exception is for cases involving two independent torts, either of which is sufficient in itself to cause the injury." (internal citation omitted)); *Sundermeyer v. SSM Regional*

---

**3.** The Court in *Callahan* further explained the origin and significance of the "two fires" case as follows:

> The law school example of the ["two fires" case] is where two independent tortfeasors set fires on opposite sides of the mountain, the fires burn toward the cabin at the top, and either is sufficient to destroy the cabin. Under these circumstances, the "but for" test fails to accurately test for causation in fact because the absence of either fire will not save the cabin. Applying the "but for" causation test to fire number one results in the conclusion that the cabin would have burned even if fire number one had not occurred because fire number two would have burned the cabin. For the same reason, applying the "but for" causation test to fire number two leads to the conclusion that the cabin would have burned even if fire number two had not occurred because fire number one would have burned the cabin. Nevertheless, it is obvious that both fires are causes in fact.

*Id.*

*Health Services,* 271 S.W.3d 552, 554 (Mo. banc 2008) ("In wrongful death actions, plaintiffs must establish that, but for the defendant's actions or inaction, the patient would not have died."); *Richey v. Philipp,* 259 S.W.3d 1, 8 (Mo.App. W.D.2008) (" 'A defendant's conduct is the cause in fact of a plaintiff's injuries where the injuries would not have occurred 'but for' that conduct.' "); *Poloski,* 68 S.W.3d at 449 ("In order to prove causation, a plaintiff must prove that 'but for' the breach of duty, the event would not have occurred."); *Peterson v. Summit Fitness, Inc.,* 920 S.W.2d 928, 936 (Mo.App. W.D.1996) ("Causation in fact is established if the plaintiff shows that 'but for' the defendant's conduct, the accident would not have occurred."). Thus, in light of *Callahan* and subsequent case law, Plaintiffs' argument that the "substantial factor" test is applicable in this case is unsustainable. The test for actual causation in fact in Missouri is "but for."

 This does not end the discussion, however; nor does it mean that Bondex and Simpson Timber automatically win. Bondex and Simpson Timber argue that it was necessary for Plaintiffs to conclusively prove that but for Mr. Wagner's exposure to the specific asbestos fiber contained in their respective products, he would not have contracted mesothelioma. Plaintiffs acknowledge that they did not and cannot make such a showing. But Bondex and Simpson Timber misperceive what "but for" causation requires. It is noteworthy, as pointed out by our Supreme Court in *Sundermeyer,* that the *Callahan* Court "cautioned that a causation analysis should not lose sight of the ultimate issue" with the following observation:

> All of this discussion concerning the semantics of causation is less important in Missouri than in most jurisdictions because under MAI we do not use the

terms 1) "proximate cause," 2) "but for causation," or 3) "substantial factor" when instructing the jury. We merely instruct the jury that the defendant's conduct must "directly cause" or "directly contribute to cause" plaintiff's injury.

271 S.W.3d at 555 (quoting *Callahan,* 863 S.W.2d at 863). Moreover, " '[b]ut for' is the minimum causation because it merely proves that defendant's conduct is causally connected to the plaintiff's injury." *Harvey v. Washington,* 95 S.W.3d 93, 96 (Mo. banc 2003). It "is neither an onerous nor difficult test for causation." *Poloski,* 68 S.W.3d at 449.

 It is likewise "clear that *Callahan* did not mean to eliminate the possibility that two or more actors can contribute to cause a result," *id.,* or that " '[t]wo causes that combine' can constitute 'but for' causation." *Harvey,* 95 S.W.3d at 96 (quoting *Callahan,* 863 S.W.2d at 862).

> The general rule is that if a defendant is negligent and his [or her] negligence combines with that of another, or with any other independent, intervening cause, he [or she] is liable, although his [or her] negligence was not the sole negligence or the sole proximate cause, and although his [or her] negligence, without such other independent, intervening cause, would not have produced the injury.

*Id.* (quoting *Carlson v. K–Mart Corp.,* 979 S.W.2d 145, 147 (Mo. banc 1998) (quoting *Gaines v. Property Servicing Co.,* 276 S.W.2d 169, 173–74 (Mo.1955)) (quoting *Harrison v. Kansas City Elec. Light Co.,* 195 Mo. 606, 93 S.W. 951, 956–57 (1906) (citing *Newcomb v. New York Cent. & H.R.R. Co.,* 169 Mo. 409, 69 S.W. 348, 352–53 (1902)))). " 'To make a prima facie showing of causation, the plaintiff must show the defendant's negligent conduct more probably than not was a cause of the injury.' It is only necessary that the de-

fendant's negligence be a cause or a contributing cause to the injury, not the exclusive cause." *Sill v. Burlington N. R.R.*, 87 S.W.3d 386, 394 (Mo.App. S.D.2002) (quoting *Nisbet v. Bucher*, 949 S.W.2d 111, 115 (Mo.App. E.D.1997)) (internal citations omitted). "The question of whether an injury in fact was caused by negligence is for the jury." *Alcorn v. Union Pac. R.R. Co.*, 50 S.W.3d 226, 239 (Mo. banc 2001). We will not reverse the jury's decision unless "there is a complete absence of probative fact to support the jury's conclusion." *Seitz v. Lemay Bank & Trust Co.*, 959 S.W.2d 458, 461 (Mo. banc 1998) (internal quotation omitted).

██ In the case of Simpson Timber, there was a complete absence of probative facts to establish a casual relationship between Simpson Timber ceiling tile and Wagner's mesothelioma. Plaintiffs' evidence established that Wagner worked with Simpson Timber ceiling tile while working for Kansas City Natural Slate and United Acoustics. But Plaintiffs failed to present any evidence that the Simpson Timber ceiling tile Wagner installed contained asbestos. While several of Wagner's co-workers testified that Wagner installed Simpson Timber ceiling tiles at Shawnee Mission South High School, Commerce Tower, and the Hallmark facilities, those co-workers were unable to state whether those ceiling tiles contained asbestos. In fact, several co-workers admitted that they could not remember the specific Simpson Timber product used and that it was not possible to discern whether a ceiling tile contained asbestos just by looking at it.

██ The Missouri Supreme Court has consistently held that a plaintiff must "establish a causal relationship between the defendants and the injury-producing agent as a precondition to maintenance of their causes of action." *Zafft*, 676 S.W.2d at 247; *see also Benjamin Moore*, 226 S.W.3d at 115. Thus, "where a plaintiff claims injury from a product, actual causation can be established only by identifying the defendant who made or sold that product." *Benjamin Moore*, 226 S.W.3d at 115. Therefore, "where the plaintiff seeks to hold the defendants liable on the basis that their products caused harm to the plaintiff, the identification requirement must be satisfied." *Id.* The record is void of any evidence that Wagner was exposed to any Simpson Timber ceiling tile product that contained asbestos.

It is undisputed that during the time period in which Wagner installed Simpson Timber ceiling tile, Simpson Timber continued to manufacture and sell non-asbestos-containing ceiling tile products. Furthermore, Wagner's co-workers were unable to testify as to the specific Simpson Timber products used at the job sites in which Wagner installed ceiling tile.

Plaintiffs argue that they presented sufficient evidence from which a reasonable juror could infer that the Simpson Timber ceiling tile that Wagner installed contained asbestos. However, this evidence is speculative, at best. One of Wagner's co-workers testified that schools typically requested ceiling tile that contained asbestos. Plaintiffs contend that because Wagner installed Simpson Timber tiles at the Shawnee Mission South High School, a juror could infer that Wagner was exposed to Simpson Timber ceiling tile that contained asbestos. Plaintiffs produced no evidence, however, that any of the schools in which Wagner installed ceiling tile requested asbestos-containing ceiling tile, nor did they present evidence that asbestos-containing ceiling tile was actually used. "[N]o fact essential to submissibility may be inferred in the absence of a substantial evidentiary basis." *Mprove v. KLT Telecom, Inc.*, 135

S.W.3d 481, 489 (Mo.App.W.D.2004). This court cannot "supply missing evidence or give the plaintiff the benefit of unreasonable, speculative, or forced inferences." *Id.* (internal quotation omitted). Plaintiffs' evidence as to Wagner's exposure to asbestos-containing ceiling tile supplied by Simpson Timber would require speculation rather than a reasonable inference based on the evidentiary facts presented.

Plaintiffs evidence against Simpson Timber amounts to nothing more than that Simpson Timber made ceiling tile, some of which contained asbestos and some which did not, and that Mr. Wagner, from time to time, installed Simpson Timber ceiling tile. This is insufficient to prove that Mr. Wagner was even exposed to asbestos by Simpson Timber. As such, there was a "complete absence of probative fact to support the jury's conclusion." *Seitz,* 959 S.W.2d at 461 (internal quotation omitted). Plaintiffs failed to make a submissible case against Simpson Timber, and, therefore, the trial court erred in denying Simpson Timber's motions for directed verdict and JNOV. Accordingly, we reverse the portion of the judgment assigning liability to Simpson Timber.

■ The evidence regarding Bondex, however, is significantly different. It was undisputed that Bondex joint compound contained asbestos during the course of the 1960s and 1970s when Wagner was exposed to it. Thus, there is no question as to whether Wagner was exposed to asbestos as a result of his contact with Bondex joint compound.

William R. Harris testified that Wagner was "right there with the rest of us" when Bondex was being mixed and sanded at the construction sites. He also stated that you could not get away from the dust that fell like snow when the tapers sanded Bondex. He further testified that he remembered using Bondex at the Commerce Tower job site at which he installed ceiling tile with Wagner.

Chester McGuire also testified that he and Wagner worked in close proximity to, and sometimes even in the same room as, the tapers sanding and mixing Bondex. He stated he remembers Bondex being used more than any other joint compound during the 1960s and that Bondex was the joint compound used at the Hallmark facilities project, Shawnee Mission South High School, and another job in St. Joseph, Missouri, at which he and Wagner installed ceiling tile.

Dr. Brody testified that mesothelioma is a cancer that affects the mesothelial cells in the lungs' pleural membrane. He explained that when asbestos fibers accumulate in the pleura, they can eventually cause genetic errors in the mesothelial cells. He went on to state that the accumulation of asbestos fibers in the lungs and the accumulation of these genetic errors have a cumulative effect that ultimately results in the cancer known as mesothelioma. He further testified that because of the disease's cumulative nature, it is impossible to identify the particular fiber that began or caused the process that resulted in mesothelioma, but that asbestos fiber in general is the only known cause of the disease.

■ Dr. Maddox also testified that mesothelioma results from an individual's cumulative exposures to asbestos and that all types of asbestos above ambient, background levels are carcinogenic and can result in mesothelioma. He further explained that patients typically experience a latency period of many years between an individual's first exposure to asbestos and the ultimate mesothelioma diagnosis. Finally, Dr. Maddox provided the expert testimony that the asbestos in the Bondex joint compound to which Mr. Wagner was

exposed contributed to cause his mesothelioma. Dr. Maddox testified that, to a reasonable degree of medical certainty, Mr. Wagner's exposure to, and inhalation of, the asbestos in Bondex joint compound on multiple occasions over several years while it was being mixed and sanded nearby "contributed to the development of [Wagner's] mesothelioma and therefore, to his eventual death."[4]

Given the undisputed fact that Bondex joint compound contained asbestos during the relevant timeframe during which Mr. Wagner was exposed to it, the testimony of his co-workers regarding the fact of his exposure to it, and the expert testimony regarding the cumulative nature of mesothelioma and the causative effect of Mr. Wagner's exposure to Bondex joint compound, a juror could reasonably conclude that the asbestos in Bondex joint compound contributed to cause Mr. Wagner's

mesothelioma and subsequent death. Therefore, the question of causation was one for the jury. Bondex's Point I is denied.

██ As noted *supra*, "[o]nce actual causation has been established, the issue becomes one of legal cause—also known as proximate cause—that is, whether the defendant should be held liable because the harm is the reasonable and probable consequence of the defendant's conduct." *Benjamin Moore*, 226 S.W.3d at 114. And so it is that Bondex's Point II asserts that Plaintiffs failed to make a submissible case because they failed to prove that Bondex's joint compound was the proximate cause of Wagner's disease.

██ While causation in fact is a question for the jury, "[p]roximate cause is a question of law for the trial court." *Payne v. City of St. Joseph*, 135 S.W.3d 444, 451 (Mo.App. W.D.2004).

---

4. After submission of this case, Bondex provided this court with a supplemental citation to *Betz v. Pneumo Abex, LLC*, 44 A.3d 27 (Pa. 2012). In *Betz*, a mesothelioma case, the trial court sustained a *Frye* challenge to the testimony of Dr. John Maddox, and the Supreme Court of Pennsylvania ultimately upheld the trial court's ruling, finding that the trial court's *Frye* assessment was not an abuse of discretion. *Id.* at 41–42, 57.

In this case, Bondex does not challenge the validity or admission of Dr. Maddox's testimony on appeal. It is not a point on appeal, nor was it argued in Bondex's brief or oral argument. Consequently, the issue "is considered abandoned in this Court." *Brizendine v. Conrad*, 71 S.W.3d 587, 593 (Mo. banc 2002). Moreover, even if Bondex had presented the issue as a point on appeal, it was not preserved. Prior to trial, Bondex did file a "Motion to Exclude Testimony of Dr. John Maddox," generally asserting that Dr. Maddox's scientific theories and methodology D were not widely accepted in the scientific community. The trial court denied the motion after hearing arguments. Bondex's motion to exclude Dr. Maddox's testimony was the equivalent of a motion in limine. *Alberswerth v.*

*Alberswerth*, 184 S.W.3d 81, 99–100 (Mo.App. W.D.2006). "[A] ruling on a motion in limine is interlocutory and, without more, preserves nothing for appellate review." *Tauvar v. American Family Mut. Ins. Co.*, 269 S.W.3d 436, 439 (Mo.App. W.D.2008). Bondex did not renew its objections prior to Dr. Maddox's testimony at trial. "[A] party must object at the time of the alleged error to preserve the issue for appellate review." *Berra v. Danter*, 299 S.W.3d 690, 695 (Mo.App. E.D.2009). "The *Frye* rule clearly deals with admissibility rather than submissibility. Admissibility only becomes an issue if there is a timely and specific objection." *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 860 (Mo. banc 1993). In this case, after all of Dr. Maddox's videotape deposition had been shown to the jury, Bondex then attempted to renew its motion to exclude the testimony. "[A] party [cannot] blissfully ignore the requirement to object to evidence based on the *Frye* doctrine and then 'back-door' the *Frye* issues. . . ." *Id.* "Since there was no objection to the testimony of [Dr. Maddox], there is no issue of admissibility presented and none is preserved for appeal." *Id.*
For these reasons, *Betz* provides no support for Bondex's arguments in this appeal.

[T]he practical test of proximate cause is whether the negligence is an efficient cause which sets in motion the chain of circumstances leading to the plaintiff's injuries or damages. The test is not whether a reasonably prudent person would have foreseen the particular injury, but whether, after the occurrences, the injury appears to be the reasonable and probable consequence of the act or omission of the defendant.

*Id.* at 450–51 (quoting *Simonian v. Gevers Heating & Air Conditioning, Inc.*, 957 S.W.2d 472, 475 (Mo.App.1997)) (internal citation omitted). "To the extent the damages are surprising, unexpected, or freakish, they may not be the natural and probable consequences of a defendant's actions." *Callahan*, 863 S.W.2d at 865.

From our description of the evidence, *supra*, it is readily apparent that Plaintiffs presented sufficient evidence from which a reasonable juror could conclude that the asbestos in Bondex's joint compound was a cause or contributed to cause Mr. Wagner's mesothelioma. The fact that Wagner's disease (his "injury") developed after he was regularly subjected to clouds of Bondex joint compound asbestos dust that fell like "snow" over a period of many years is not "surprising, unexpected, or freakish," nor is it an unreasonable or improbable consequence. The expert testimony regarding the nature of the disease and its development, the evidence of Mr. Wagner's significant exposure to the joint compound, and Dr. Maddox's expert testimony that the asbestos in the Bondex joint compound to which Mr. Wagner was exposed contributed to cause his mesothelioma combined is more than enough to satisfy the proximate cause prong of causation.

Bondex nonetheless argues that the evidence did not satisfy the "*Lohrmann* test" to prove proximate cause where the alleged injuries stem from asbestos exposure. In *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156 (4th Cir.1986), in an effort to insure that evidence of exposure to asbestos, in a circumstantial evidence case, was more than *de minimis*, the court adopted the following test:

To support a reasonable inference of substantial causation from circumstantial evidence, there must be evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked.

*Id.* at 1162–63. A variation of the test was adopted by the Eighth Circuit in *Chism v. W.R. Grace & Co.*, 158 F.3d 988, 992 (8th Cir.1998). To establish proximate cause under the *Lohrmann* test as enunciated in *Chism*, the plaintiff must establish that he or she has been "(1) expos[ed] to a particular product; (2) on a regular basis; (3) over an extended period of time; and (4) in proximity to where the plaintiff actually worked." *Chism*, 158 F.3d at 992.

At the outset, we note, as our Supreme Court has observed, that "[f]ederal authorities are of interest but not controlling." *Int'l Minerals & Chem. Corp.*, 817 S.W.2d 903, 905 (Mo. banc 1991). Our research uncovered no Missouri case that has adopted the "*Lohrmann* test." Moreover, we likewise are mindful that *Lohrmann* was an asbestosis case, where greater exposure to asbestos is required to produce disease, as opposed to mesothelioma, which can result from much lower relative exposure to asbestos.

■ We need not decide, however, whether *Lohrmann* applies in Missouri. Suffice it to say that, even if it does, Plaintiffs presented sufficient evidence that a reasonable juror could find that the frequency, regularity, and proximity in which Wagner was exposed to Bondex joint compound was the proximate cause of Wagner's mesothelioma. As previously

discussed, Wagner's co-workers testified that they frequently worked in close proximity to tapers mixing and sanding Bondex joint compound. Harris and McGuire testified that Wagner would have inhaled dust from the sanding of Bondex joint compound at several of the work sites at which he installed ceiling tile, specifically at Shawnee Mission South High School, Commerce Tower, and the Hallmark facilities. The evidence also established that Wagner worked at these sites for several months, sometimes even years, at a time. Thus, the evidence was more than sufficient to establish that Wagner was (1) exposed to Bondex (2) on a regular basis (3) over an extended period of time (4) in proximity to where he was working. Bondex's Point II is denied.

In Points III and IV, Bondex presents claims of instructional error. Point III asserts the trial court erred in submitting instructions 7A and 8A to the jury because those instructions failed to hypothesize disputed facts essential to Plaintiffs' claims in that the jury was required to assume actual causation. In Point IV, Bondex claims the trial court erred in refusing to submit withdrawal instructions regarding post-exposure exhibits and Julius Nemeth's related testimony because that evidence misled the jury and created a false issue that was not relevant to prove an issue at trial after Bondex's motion for directed verdict on aggravated circumstances and punitive damages was granted.

■■■ "We review, *de novo*, whether a jury was properly instructed." *Koppe v. Campbell*, 318 S.W.3d 233, 243 (Mo.App. W.D.2010). "Although our review is *de novo*, we do view the evidence in the light most favorable to the submission of the instruction and we disregard evidence and inferences to the contrary." *Myers v. Farm Bureau Town & Country Ins. Co.*, 345 S.W.3d 341, 348 (Mo.App. S.D.2011)

(internal quotation omitted). Furthermore, this court will not reverse on instructional error unless we "find that the instruction at issue misdirected, misled or confused the jury and prejudice resulted." *Id.*

In Point III, Bondex asserts that the trial court erred in submitting instructions 7A and 8A to the jury because the instructions failed to hypothesize disputed facts essential to Plaintiffs' claims in that the jury was required to assume actual causation rather than determine actual causation as set out in *Hagen*. Bondex claims that "[n]othing in the instruction permitted or instructed the jury to consider whether Wagner's exposure to Bondex was of such a dose, frequency or long duration as to be the actual cause of Wagner's disease" and, thus, the instructions "should have been modified pursuant to *Hagan* [sic] to require the jury to explicitly make the finding that Wagner's exposure to Bondex's joint compound was the but for cause of his disease." Bondex contends that without such modification, the jury could find against Bondex solely on the basis that asbestos causes mesothelioma and Bondex joint compound contained asbestos.

■■ Instruction 7A submitted MAI 25.04, Strict Liability–Product Defect, and Instruction 8A submitted MAI 25.05, Strict Liability–Failure to Warn. Both instructions contained the MAI 19.01 "Verdict Directing Modification–Multiple Causes of Damage." When an MAI instruction is applicable, its use is mandatory, *Rule 70.02(b)*, and the failure to give the MAI instruction is error. *Rule 70.02(c); Rice v. Bol*, 116 S.W.3d 599, 606 (Mo.App. W.D. 2003). Since Instructions 7A and 8A follow the language of the appropriate MAIs exactly, "this court has no power to declare the submission of the MAI instruction erroneous." *Wailand v. Anheuser*

*Busch, Inc.,* 861 S.W.2d 710, 717 (Mo.App. E.D.1993).

■ Moreover, our Supreme Court has repeatedly stated that the "directly cause" or "directly contribute to cause" language properly instructs the jury as to causation, whereas the substantial factor or "but for" language is reserved for use by the courts in determining if a case is submissible to the jury. *See Hagen,* 816 S.W.2d at 673 (stating that the substantial factor language "provides a standard for the trial court in the exercise of its duty to determine whether a submissible case has been made and not a formula for instructing the jury"); *Callahan,* 863 S.W.2d at 863 (stating that "discussion concerning the semantics of causation is less important in Missouri than in most jurisdiction because under MAI we do not use the terms 1) 'proximate cause,' 2) 'but for causation,' or 3) 'substantial factor' when instructing the jury"; instead "[w]e merely instruct the jury that the defendant's conduct must 'directly cause' or 'directly contribute to cause' plaintiff's injury"). Thus, in Missouri, the jury is not required to make explicit findings as to whether the plaintiff has established "but for" causation, and to instruct the jury to do so would be improper and erroneous.

■ Bondex's further argument that the instructions were erroneous because they assumed disputed facts is likewise without merit. It is true that instructions submitted to the jury "must hypothesize the facts essential to the plaintiff's claim" and that "[a]ssuming a disputed fact is erro[neous]." *Lasky v. Union Elec. Co.,* 936 S.W.2d 797, 800 (Mo. banc 1997). But nothing in the verdict director required the jury to assume that Wagner's exposure to Bondex was of such a dose, frequency or long duration to cause his mesothelioma. Rather, the jury was free to consider such factors in determining whether Bondex joint compound "directly caused" or "directly contributed to cause" Wagner's mesothelioma. Therefore, unlike the cases cited by Bondex, the jury was not forced to assume a disputed fact in reaching its verdict. *See Lasky v. Union Elec. Co.,* 936 S.W.2d 797, 799 (Mo. banc 1997) (involving a verdict director that stated "defendant knew or by using ordinary care should have known that plaintiff had come into contact with the cooling fluid from defendant's transformer" when there was a factual dispute at trial as to whether plaintiffs actually came in contact with the cooling fluid); *Spring v. Kansas City Trasp. Auth.,* 873 S.W.2d 224, 226 (Mo. banc 1994) (involving a verdict director that stated "defendant . . . caused the bus to move forward and suddenly stop when he knew, or should have known, that plaintiff had not yet reached a place of safety in the bus" when a factual dispute existed at trial as to whether the plaintiff had reached a place of safety when defendant moved the bus). The instructions complained of did not misdirect, mislead, or confused the jury. Point denied.

■ Bondex's other claim of instructional error, Point IV, asserts the trial court erred in refusing to submit a withdrawal instruction regarding post-exposure exhibits and Julius Nemeth's related testimony. At trial, Plaintiffs presented Nemeth's testimony and introduced the related exhibits. The trial court later granted Bondex's motion for directed verdict on the issue of aggravated circumstances damages, finding that Plaintiffs failed to produce any evidence that Bondex showed complete indifference or conscious disregard for the safety of others. Bondex then requested that the court issue a withdrawal instruction as to the post-exposure exhibits and Nemeth's related testimony, but the trial court refused, finding that

such evidence was relevant to Plaintiffs' negligence or failure to warn claims. Bondex claims that such evidence was only relevant to Plaintiffs' aggravated circumstances claim and not issuing a withdrawal instruction prejudiced the jury by creating a false issue.

▬▬▬ "Giving a withdrawal instruction is left to the sound discretion of the trial court." *Foster v. Catalina Indus., Inc.,* 55 S.W.3d 385, 394 (Mo.App. S.D. 2001). And although "[w]ithdrawal instructions should be given when there is evidence which might mislead the jury in its consideration of the case as pleaded and submitted," *Arnold v. Ingersoll–Rand Co.,* 908 S.W.2d 757, 764 (Mo.App. E.D.1995), "[f]ailure to give a withdrawal instruction is reversible error only when the evidence sought to be withdrawn creates a false issue." *Foster,* 55 S.W.3d at 394. "[O]n appeal, discretionary rulings are presumed correct, and the appellant bears the burden of showing an abuse of discretion." *Anglim v. Mo. Pac. R.R. Co.,* 832 S.W.2d 298, 303 (Mo. banc 1992).

Here, the trial court determined that Nemeth's testimony and post exposure exhibits were relevant to Plaintiffs' negligence and failure to warn claims. As noted *supra,* in this appeal, Bondex claims the trial court erred in doing so and should have given the requested withdrawal instruction. From the transcript, it appears that Nemeth's testimony and the exhibits were contained in his videotaped deposition, which was shown to the jury. In its brief, Bondex gives a brief description of Nemeth's testimony and the exhibits and cites to Court Exhibit 7, which is not part of the record. Thus, we do not have before us the testimony or exhibits about which Bondex now complains.

▬▬▬ "This court's review is based only on the record on appeal." *Dale v. Director, Mo. Dept. of Soc. Servs., Family Support & Children's Div.,* 285 S.W.3d 770, 772 (Mo.App. S.D.2009). It is the appellant's burden to supply the record necessary for our review. *O'Bernier v. R.C. & Assocs., Inc.,* 47 S.W.3d 422, 423 (Mo.App. S.D.2001). "An incomplete record forecloses appellate review because it does not contain 'all of the record, proceedings, and evidence necessary to the determination of all questions presented.'" *Id.* (quoting *Smith v. Associated Natural Gas Co.,* 7 S.W.3d 530, 535 (Mo.App. S.D. 1999)). Moreover, "[w]here no transcript is filed or exhibits are not made a part of the record on appeal, such evidentiary omissions will be taken as favorable to the trial court's ruling and unfavorable to the appeal." *Saturn of Tiffany Springs v. McDaris,* 331 S.W.3d 704, 712 (Mo.App. W.D.2011). Without Nemeth's testimony and the related exhibits, " 'there is nothing for this court to review.'" *Dale,* 285 S.W.3d at 772 (quoting *Jaggie v. Attaran,* 70 S.W.3d 595, 597 (Mo.App.2002)). "This court will not convict a trial court of error when it does not know what evidence was before it." *Id.* Accordingly, Point IV is denied.

▬▬▬ In its final point, Bondex claims that the trial court erred in failing to reduce the jury's verdict by the amounts available from the asbestos bankruptcy trusts because it has a right to such an offset under § 537.060 and common law mitigation of damages principles. "The interpretation of a statute is a question of law, and appellate review is *de novo.*" *Nelson v. Crane,* 187 S.W.3d 868, 869 (Mo. banc 2006) (italics added). "The primary rule in statutory construction is to ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider the words in their plain and ordinary meaning." *Id.* at 869–70.

Bondex claims that it has a right for the judgment to be reduced by the amounts it alleges Plaintiffs are entitled to receive from the bankruptcy trusts pursuant to § 537.060, which provides, in pertinent part:

When an agreement by release, covenant not to sue or not to enforce a judgment is given in good faith to one of two or more persons liable in tort for the same injury or wrongful death, such agreement shall not discharge any of the other tort-feasors for the damage unless the terms of the agreement so provide; however such agreement shall reduce the claim by the stipulated amount of the agreement, or in the amount of consideration paid, whichever is greater. The agreement shall discharge the tort-feasor to whom it is given from all liability for contribution or noncontractual indemnity to any other tort-feasor.

"[S]ection 537.060 codifies a subset of the common law defense of satisfaction," *Stevenson v. Aquila Foreign Qualifications Corp.*, 326 S.W.3d 920, 925 (Mo.App. W.D. 2010), and "provides a mechanism for reducing an award of actual damages by amounts that were settled upon by other joint tortfeasors also responsible for damages and by the damaged party." *Hogan v. Armstrong World Industs., Inc.*, 840 S.W.2d 230, 236 (Mo.App. W.D.1992). Nevertheless, Bondex asserts that *Hogan* and § 537.060 required the trial court to delay entry of the judgment until Plaintiffs have applied to and entered into settlement agreements with the bankruptcy trusts of six former asbestos manufacturers.[5]

Contrary to Bondex's argument, nothing in the plain language of § 537.060 can be interpreted to entitle litigating tort-feasors to a reduction in judgment from settlement agreements plaintiffs have never sought, negotiated, or reached with other joint tortfeasors. Section 537.060 simply provides that *"[w]hen an agreement by release, covenant not to sue or not to enforce a judgment is given in good faith to one of two or more persons liable in tort for the same injury or wrongful death[,] ... such agreement shall reduce the claim by the stipulated amount of the agreement, or in the amount of consideration paid, whichever is greater."* *Id.* (emphasis added). Thus, § 537.060 does nothing more than outline the procedure for reducing a judgment when, in a case involving multiple tortfeasors, the plaintiff enters into a settlement agreement with one or more of the tortfeasors and proceeds to trial against the remaining joint tortfeasors.

Furthermore, Bondex's reliance on *Hogan* is misplaced. In *Hogan*, the trial court reduced the plaintiff's judgment by $33,500.00, the sum total of the settlement amounts the plaintiffs had entered into with other asbestos manufacturers. *Id.* at 231. The plaintiff appealed, claiming the trial court erred in reducing the award by the settlement amounts he had not yet received. *Id.* At the time of the judgment, the plaintiff had received only $6,000.00 from the entities with whom he had obtained settlement agreements. *Id.* at 233. We held that "[t]he statute does not say that the award shall be reduced by the monies received, but by the stipulated amount of the agreement or the amount of the consideration paid," *id.* at 236, and that

---

**5.** Bondex claims Plaintiffs must seek settlement agreements from the bankruptcy trusts of six entities: (1) Armstrong World Industries, (2) Celotex Corporation, (3) United States Gypsum, (4) Federal Mogul Corporation, (5) National Gypsum, and (6) Johns–Mansville. None of these entities was named a defendant in the original lawsuit brought by Plaintiffs.

"*[p]arties to a voluntary settlement* cannot avoid their agreement because that agreement proves to be disadvantageous." *Id.* at 237 (emphasis added). Thus, the Court in *Hogan* merely interprets § 537.060 and addresses the amount by which plaintiffs' damages should be reduced under the statute when a plaintiff has *voluntarily* entered into a settlement agreement with a joint tortfeasor. No such settlement agreement exists between Plaintiffs and any of the six bankruptcy trusts from which Bondex claims Plaintiffs are entitled to collect settlement amounts from as joint tortfeasors.

Finally, it is a longstanding principle of Missouri tort law that "a plaintiff may sue all or any of the joint or concurrent tort-feasors and obtain a judgment against all or any of them." *Burg v. Dampier*, 346 S.W.3d 343, 360 (Mo.App. W.D.2011) (internal quotation omitted). In fact, a plaintiff has a right to pursue and collect from any tortfeasor of his choosing regardless of any right to contribution that the other defendants may have. *Magnuson v. Kelsey–Hayes Co.*, 844 S.W.2d 448, 452 (Mo.App. W.D.1992). "A defendant may not object that [a] plaintiff has not sued another tortfeasor or that the case against that tortfeasor has been dismissed." *Id.* Accordingly, Plaintiffs had the right to sue and seek settlement from the tortfeasors of their choosing. It follows, then, that the trial court cannot delay entry of judgment and force Plaintiffs to seek settlement agreements with bankruptcy trusts of asbestos manufacturers in order to reduce the judgment against Bondex. Bondex's Point V is denied.

We turn now to Plaintiffs' sole point on cross-appeal. Plaintiffs assert the trial court erred in reducing the judgment by the amount of $900,000.00 because a $900,000.00 settlement agreement was never actually reached between Plaintiffs and T.H. Agriculture & Nutrition LLC "(THAN)". "We will affirm the judgment of the trial court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law." [6] *Stevenson*, 326 S.W.3d at 924 (citing *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)); *see also Norman v. Wright*, 100 S.W.3d 783, 785 (Mo. banc 2003). "We defer to the trial court on factual issues and view the evidence and all reasonable inferences drawn there from in the light most favorable to the trial court's judgment, disregarding all contrary evidence." *Stevenson*, 326 S.W.3d at 924. "However, we independently evaluate whether the trial court properly declared or applied the law to the facts presented." *Id.*

THAN, who was originally a defendant in this case, filed for bankruptcy. Believing he had reached a $900,000.00 oral settlement agreement with THAN as to Plaintiffs' claim, Plaintiffs' counsel advised Plaintiffs and his other clients to approve

---

6. In *Gibson v. City of St. Louis*, 349 S.W.3d 460, 465 (Mo.App.E.D.2011), the Eastern District recognized a disparity in the treatment of reductions in judgment by a trial court pursuant to § 537.060 on appeal. The court in *Gibson* ultimately determined the appropriate standard of review was *de novo* because "the trial court rules as a matter of law." *Id.* Such is not the case here, as the trial court's decision was dependent upon factual determinations it made. Accordingly, we review the trial court's decision to reduce the judgment pursuant to the standard of review set forth in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976), as used by this court and the Missouri Supreme Court. *See Stevenson*, 326 S.W.3d at 924 (citing *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)); *see also Norman v. Wright*, 100 S.W.3d 783, 785 (Mo. banc 2003) (citing *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)).

THAN's plan of reorganization. THAN and its parent company, however, contested the existence of the $900,000.00 agreement, and a hearing was held on the matter in a federal bankruptcy court. The bankruptcy court ultimately found that Plaintiffs' counsel's "neglect in timely filing an objection to the [reorganization plan] is not excusable" and denied Plaintiffs' counsel's motion to extend its time to file objections to THAN's plan of reorganization. The bankruptcy court went on to state that it "makes no findings as to the allegations in [Plaintiffs' counsel's motion] as to what it may or may not have been promised."

Plaintiffs then filed their motion to dismiss and for entry of amended judgment in the trial court, requesting that the court change the amount reduced from the judgment for the THAN settlement from $900,000.00 to $510,000.00. The motion stated that "Plaintiffs have now received settlement proceeds from the THAN bankruptcy trust in the amount of $510,000.00, not the $900,000 amount entered by the Court. Plaintiffs believe that this is the total amount that they will receive from this trust." A hearing was held on Plaintiffs' motion, as well as other motions pending in the matter, before the trial court. Plaintiffs presented no evidence to the trial court as to the actual amount of the settlement agreement it reached with THAN.

The trial court ultimately denied Plaintiffs' motion to amend the judgment, finding the following:

[T]he amount of the judgment credit remains $900,000.00 for the settlement with T.H. Agriculture and Nutrition LLC ("THAN"); and is not reduced to the amount of $510,000.00 Plaintiffs now attempt to claim. The Court finds that R.S.Mo. § 537.060 and *Hogan v. Armstrong World Industries*, 840 S.W.2d 230, 236–37 (Mo.App. W.D.1992) remain the controlling authority on point. The law is—the credit is the "stipulated amount of the agreement, or [ ] the amount of consideration paid, *whichever is greater.*" § 537.060 (emphasis added). The only evidence submitted to this Court concerning the above dispute is the stipulated amount of the agreement for $900,000.00. Plaintiffs' counsel stated $510,000.00 was received in actual payment from THAN and that they did not expect to receive more from THAN; but submitted no evidence of either proposition. Regardless, the stipulated amount of the agreement (which is in evidence) is greater than the purported amount received. Even if Plaintiffs adduced evidence, this Court is obligated to follow the law and enter credit for the greater amount of $900,000.00.

Plaintiffs assert that the trial court erred in reducing the judgment by $900,000.00 because the bankruptcy court found that there was no valid agreement between THAN and Plaintiffs for that amount. Plaintiffs contend that without a valid settlement agreement between them and THAN, the trial court could not reduce Plaintiffs' judgment by what the trial court perceived to be a settlement agreement for $900,000.00 for purposes of § 537.060. Bondex contends that it is still entitled to the $900,000.00 reduction because sufficient evidence existed by which the court could find that a $900,000.00 settlement agreement had been reached between Plaintiffs and THAN.

■ The trial court's determination that a $900,000.00 settlement agreement existed is not against the weight of the evidence. Plaintiffs hang their hats on the actions of the bankruptcy court. But the order issued by the bankruptcy court clearly states that it "makes no findings as to the allegations in [Plaintiffs' counsel's

motion] as to what it may or may not have been promised."

Evidence was presented by the Defendants to the trial court as to the amount of the settlement entered into between Plaintiffs and THAN. That evidence consisted of a sworn declaration by Plaintiffs' counsel to a federal bankruptcy court that Plaintiffs' counsel had obtained a settlement agreement on behalf of Plaintiffs for $900,000.00 with THAN. In their motion for amended judgment and at the hearing on that motion, Plaintiffs merely asserted that they had received $510,000.00 from the bankruptcy trust and did not expect to receive any more money from the trust. Plaintiffs introduced no evidence as to the actual settlement agreement reached between Plaintiffs and the THAN bankruptcy trust.

The trial court determined that although Plaintiffs stated they had received only $510,000.00 from the THAN bankruptcy trust, the only evidence before it was a settlement agreement for the amount of $900,000.00; thus, in accordance with § 537.060 and *Hogan*, it must reduce the judgment by the stipulated amount of the agreement, $900,000.00, not by the amount of monies received, $510,000.00. Given the evidence before the trial court, such a finding was not against the weight of the evidence. Point denied.

We now must consider the effect our reversal of the judgment as to Simpson Timber will have on the damages awarded in this case. Traditionally, Missouri courts have held that "joint tort-feasors are jointly and severally liable for the harm caused to a plaintiff," *Burg*, 346 S.W.3d at 360 (internal quotation omitted), and "[a]pportionment of relative fault between defendants has no effect on a plaintiff's right to collect the full amount from any one of the defendants." *Elfrink v. Burlington N. R.R. Co.*, 845 S.W.2d 607, 615 (Mo.App.

E.D.1992). However, Missouri enacted HB 393 in 2005 which, among other things, amended § 537.067. Section 537.067 now provides:

In all tort actions for damages, if a defendant is found to bear fifty-one percent or more of fault, then such defendant shall be jointly and severally liable for the amount of the judgment rendered against the defendants. *If a defendant is found to bear less than fifty-one percent of fault, then the defendant shall only be responsible for the percentage of the judgment for which the defendant is determined to be responsible by the trier of fact.*

(Emphasis added). Section 538.305, also a part of HB 393, provides that "[t]he provisions of this act, except for section 512.099, RSMo, shall apply to all causes of action filed after August 28, 2005." Mr. Wagner died in 2007, and this case was filed thereafter. Accordingly, § 537.067 as amended in 2005 is applicable. *White v. Tariq*, 299 S.W.3d 1, 4 (Mo.App. E.D.2009).

As noted *supra*, the original jury verdict entered in this case assessed $4,500,000 in total damages for the wrongful death of Robert Wagner, and apportioned fault 20% to Bondex, 35% to Simpson Timber and 45% to Conwed. Because none of the defendants were found to bear 51 % or more of fault, by virtue of the plain language of § 537.067, none of the defendants are considered jointly and severally liable for the total damages. In its May 25, 2010 Order and Final Judgment, the trial court reduced the total damages by $1,425,000, leaving a total damage award after offset of $3,075,000. The trial court then entered judgment against each of the defendants for their respective apportioned amount: Conwed for $, 1,383,750.00; Simpson Timber for $1,076,250.00; and Bondex for $615,000.00. Since we have found the case against Simpson Timber should not have

been submitted and the judgment against it must be reversed, thirty-five per cent (35%) of the $3,075,000.00 judgment after set-off is unapportioned.

The Missouri Supreme Court's decision in *McHaffie v. Bunch,* 891 S.W.2d 822 (Mo. banc 1995) is instructive. The facts of the case were as follows:

> McHaffie was a passenger in a vehicle driven by Cindy D. Bunch. The Bunch vehicle left the eastbound lanes of Interstate 44, crossed the median, travelled across the westbound lanes, struck a guardrail, and collided with a westbound tractor-trailer. The tractor-trailer was operated by Donald R. Farmer. Bruce Transport and Leasing was the owner-lessor of the truck, and Rumble Transport was the operator-lessee of the truck. The plaintiff's claim against Bunch was that she was negligent for failing to drive on the correct side of the road. Farmer was alleged to have failed to keep a careful lookout or failed to stop, swerve or slacken his speed when he should have done so. Claims were made that Farmer was an employee of Bruce and Rumble and, as such, those two defendants were vicariously liable for Farmer's negligence.

*Id.* at 824. In addition, plaintiff also submitted a negligent hiring claim against Rumble. *Id.* The jury awarded total damages of $5,258,000.00 to the plaintiff. "The jury assessed percentages of fault as 70% to Bunch, 10% to Farmer, Bruce and Rumble based on Farmer's negligence and Bruce and Rumble's vicarious liability, 10% to Rumble based on negligent hiring, and 10% to plaintiff based on riding with an intoxicated person." *Id.* at 825.

On appeal, the Court noted that Rumble admitted that Farmer was its employee. Consequently, evidence of negligent hiring "was unnecessary because vicarious liability had already been established under the theory of *respondeat superior* under which the employer is strictly liable for all fault attributed to the negligent employee." *Id.* at 826–27. Accordingly, the Court held "that once the agency relationship was admitted, it was error to permit a separate assessment of fault to defendant Rumble based upon the 'negligent entrustment' or 'negligent hiring' theories of liability. It was also error to admit evidence on those theories." *Id.* at 827.

The Court then turned to the question of the scope of remand. It found that the erroneously admitted evidence and submission prejudiced Farmer, Bruce and Rumble, but there was none to Bunch or McHaffie, or as to the total amount of damages. *Id.* Relying on *Kibbons v. Union Electric Co.,* 823 S.W.2d 485 (Mo. banc 1992), the Court found that the jury's verdict fixed the amount of total damages, and the only issue on remand would be the allocation of fault as to the 20% of fault originally allocated to Farmer, Bruce and Rumble. *Id.* at 828. Thus, the Court ultimately held as follows:

> [W]e conclude that plaintiff's total damages are fixed at $5,258,000. A retrial is ordered to allocate the 20% of fault previously attributed to Farmer, Rumble, and Bruce. The jury will be instructed to allocate fault as follows: at least 70% but no more than 90% shall be attributed to defendant Bunch; not more than 20% may be attributed to defendants Farmer, Bruce and Rumble; at least 10% but no more than 30% to plaintiff McHaffie; and the three percentages must total 100%.

*Id.*

The same rationale applies in the instant appeal. The jury fixed the total damages for the wrongful death of Mr. Wagner at $4,500,000.00. The case is remanded for a retrial for the sole purpose of allocating the 35% of fault previously

assessed against Simpson Timber. The jury will be instructed to allocate fault as follows: at least 45% but no more than 80% shall be attributed to defendant Conwed Corporation; at least 20% but no more than 55% shall be attributed to defendant Bondex; and the two percentages must total 100%. The evidence on retrial is limited to the evidence presented in the original trial, provided however, that all evidence relative to Simpson Timber exclusively shall be excluded. Since the original judgment is final as between Plaintiffs and defendant Conwed Corporation, Conwed need not participate in the retrial nor can it be held liable for any fault apportioned to it on retrial in excess of the 45% allocated to it in the original judgment. Accordingly, judgment on remand can only be rendered against Bondex, and should not purport to enter judgment against Conwed, although the percent of fault attributed to Conwed by the jury on remand may be reflected for informational and explanatory purposes.[7]

For the foregoing reasons, the judgment as to the amount of damages is affirmed. The judgment against Defendant Simpson Timber is reversed. The assessment of fault is reversed, and the cause is remanded to the trial court with directions to retry the issues of apportionment of fault between defendants Bondex and Conwed all in conformity with this opinion.

All concur.

---

7. This case is distinguishable from *Bland v. IMCO Recycling, Inc.*, 67 S.W.3d 673 (Mo. App. S.D.2002), where total damages were fixed at $4,000,000.00, with 40% assessed against defendant Metal Mark and 60% against defendant IMCO. The Southern District reversed the judgment against Metal Mark and held IMCO, as the lone remaining defendant, solely liable for the full verdict. *Id.* at 685. Here, the judgment below remains valid as to two defendants, both Conwed and Bondex, even though it is final as to Conwed, and being remanded as to Bondex.