**Jeanette G. POAGE, Respondent,**

v.

**CRANE CO., Appellant.**

**No. ED 103953**

Missouri Court of Appeals,
Eastern District,
DIVISION TWO.

Filed: May 2, 2017

Application for Transfer to Supreme Court Denied June 8, 2017

498

502

504

Robert T. Haar, Susan E. Bindler, Colleen O. Zern, for Defendant/Appellant.

Benjamin R. Schmickle, St. Louis, MO, Michael A. Gross, Joseph F. Yeckel, Clayton, MO, Robert W. Cowan, Houston, TX, for Plaintiff/Respondent.

## OPINION

Colleen Dolan, Judge

Jeanette G. Poage ("Mrs. Poage") filed a products liability suit against Crane Co. ("Crane") alleging that her husband, James E. Poage ("Mr. Poage") suffered personal injuries and wrongful death from mesothelioma, which was caused by Crane's asbestos-containing products. Mrs. Poage's claims were based on Crane's (1) failure to warn and (2) defective design under strict liability and negligence theories. After a trial, the jury returned a verdict in favor of Mrs. Poage, awarding her compensatory damages and punitive damages. Crane now appeals arguing there was insufficient evidence to find Crane liable, and alternatively, that even if Crane could be found liable, the amount of punitive damages should be reduced because the award violates Crane's due process, goes beyond "fair and reasonable compensation," and exceeds Missouri's statutory cap. Additionally, Crane argues the trial court erred in failing to reduce the judgment by amounts available in the asbestos trust under § 537.060 and the common law.[1]

## I. Factual and Procedural Background

The relevant facts adduced at trial will be discussed under the relevant points on appeal. Nonetheless, we will briefly discuss the uncontroverted factual background and the procedural history of this case here.

Mr. Poage joined the Navy in April of 1954. From 1954 until 1958, Mr. Poage served as a machinist on a World War-II era ship named the *USS Haynsworth*. During his service, he helped upkeep the valves on the Haynsworth, which required replacing gaskets and packing. Mrs. Poage alleged some of the gaskets and packing were asbestos-laden products produced by Crane, which caused Mr. Poage to inhale asbestos dust and eventually develop mesothelioma. Mr. Poage died from mesothelioma in May 2012. Mr. Poage was never deposed, as Mrs. Poage filed the lawsuit after Mr. Poage's death.

On January 10, 2013, Mrs. Poage filed her petition in the Twenty–Second Judicial Circuit Court claiming that that Crane was liable to her for damages under two different theories: (1) strict liability and (2) negligence, both of which were based on defective design and failure to warn. *See Magnuson by Mabe v. Kelsey–Hayes Co.*, 844 S.W.2d 448, 455 (Mo. App. W.D. 1992) (explaining that a products liability claim can arise from (1) a design defect, (2) a manufacturing defect, and/or (3) a failure to warn of danger).

A jury trial was held from June 23, 2015 to July 2, 2015. On July 2, 2015, the jury returned a verdict in favor of Mrs. Poage, awarding her $1,500,000 in compensatory damages and $10,000,000 in punitive damages. On September 14, 2015, pursuant to § 537.060, the trial court reduced the compensatory award to $822,250 based on Mrs. Poage's settlement agreements with joint tortfeasors, and it entered judgment against Crane for that amount, as well as $10,000,000 in punitive damages.

Crane then filed post-trial motions for judgment notwithstanding the verdict, a new trial, remittitur, and/or an amendment to the judgment on October 14, 2015. Crane's motion for judgment notwithstanding the verdict was based on its contention that Mrs. Poage failed to make a

---

1. All statutory reference are to RSMo 2000 unless otherwise specified.

submissible case by failing to present sufficient evidence to support a verdict in her favor. On January 12, 2016, all of Crane's post-trial motions were overruled pursuant to Rule 78.06 and deemed "final" for purposes of appeal pursuant to Rule 81.05(a)(2)(A), because the trial court did not rule on them within 90 days.[2]

Crane now appeals and is seeking (1) "reversal of the judgment as a matter of law, or at a minimum a new trial, based upon [Mrs. Poage's] failure to meet her burden of proving necessary factual prerequisites of the breach-of-duty and causation elements of her claims"; and (2) reversal, or at least a substantial reduction, of Mrs. Poage's award of punitive damages.

## II. Discussion

**Point I: The trial court did not err in overruling Crane's motion for judgment notwithstanding the verdict because Mrs. Poage made a submissible claim.**

In Crane's first point on appeal, it argues that Mrs. Poage failed to make a submissible claim because (1) she failed to establish cause in fact, (2) she failed to establish proximate cause, and (3) Crane owed no duty to Mr. Poage because any gaskets or packing on the *Haynsworth* at the time Mr. Poage served were not manufactured or supplied by Crane. Accordingly, Crane contends that the trial court erred by denying its judgment notwithstanding the verdict.

**a. Standard of Review for Judgment Notwithstanding the Verdict**

■ To determine whether a judgment notwithstanding the verdict should

have been granted, appellate courts apply "essentially the same standard" as a *de novo* review. *Ellison v. Fry*, 437 S.W.3d 762, 768 (Mo. banc 2014). When reviewing a circuit court's denial of a judgment notwithstanding the verdict, the reviewing court must decide whether the plaintiff made a submissible case by offering sufficient evidence to support every element required for liability. *Id.* In determining whether the plaintiff made a submissible case, we view the evidence in the light most favorable to the plaintiff. *Smith v. Brown & Williamson Tobacco Corp.*, 410 S.W.3d 623, 630 (Mo. banc 2013) (herein "*Smith II*").[3] We will only reverse the jury's decision if "there is a complete absence of probative fact to support the jury's conclusion." *Id.* (quoting *Dhyne v. State Farm Fire & Cas. Co.*, 188 S.W.3d 454, 457 (Mo. banc 2006)). "A judgment notwithstanding the verdict is a drastic action that can only be granted if reasonable persons cannot differ on the disposition of the case." *Delacroix v. Doncasters, Inc.*, 407 S.W.3d 13, 39 (Mo. App. E.D. 2013).

**b. Available Products Liability Claims in Missouri**

■ Under Missouri products liability law, a plaintiff has three theories of recovery available to her: strict liability, negligence, and breach of warranty. *Welsh v. Bowling Elec. Mach., Inc.*, 875 S.W.2d 569, 572 (Mo. App. S.D. 1994); *Linegar v. Armour of America*, 909 F.2d 1150, 1152 (8th Cir. 1990). In the present case, the jury found Crane liable to Mrs. Poage under

---

**2.** All references to Rules are to Missouri Supreme Court Rules (2015).

**3.** This opinion includes citations to two cases involving the same two parties: (1) *Smith v. Brown & Williamson Tobacco Corp.*, 275

S.W.3d 748 (Mo. App. W.D. 2008) (*Smith I*); and (2) *Smith v. Brown & Williamson Tobacco Corp.*, 410 S.W.3d 623 (Mo. banc 2013) (*Smith II*).

theories of (1) strict liability and/or (2) negligence.

### c. Strict Products Liability Claims

 To determine whether a plaintiff has made a submissible case based on a strict products liability claim, Missouri applies the test set forth in Restatement (Second) of Torts, § 402(A), which is codified by § 537.760. *Engel v. Corrigan Co.–Mech. Contractors, Inc., a Div. of Corrigan Bros., Inc.*, 148 S.W.3d 28, 30 (Mo. App. E.D. 2004). To make a submissible case under a strict products liability theory in Missouri, the plaintiff must show:

> (1) the defendant sold a product in the course of its business; (2) the product was then in a defective condition, unreasonably dangerous when put to a reasonably anticipated use; (3) the product was used in a manner reasonably anticipated; and (4) the plaintiff was damaged as a direct result of such defective condition as existed when the product was sold.

*Strong v. Am. Cyanamid Co.*, 261 S.W.3d 493, 506 (Mo. App. E.D. 2007), *opinion adopted and reinstated after retransfer (Oct. 6, 2008) overruled on other grounds by Badahman v. Catering St. Louis*, 395 S.W.3d 29 (Mo. banc 2013); § 537.760; Restatement (Second) of Torts, § 402(A). Accordingly, "[t]he strict liability theory is further divided into liability for [1] defective design of a product and [2] liability for failure to warn of an inherent danger in the product." *Linegar*, 909 F.2d at 1152.

### d. Negligence Products Liability Claims

 To submit a case for negligence, a plaintiff must show that "the defendant had a duty to protect him from injury, the defendant failed to perform that duty, and the defendant's failure proximately caused his injury." *Strong*, 261 S.W.3d at 506.

Under both strict liability and negligence theories, the plaintiff is required to show a causal connection between the defendant's conduct and the plaintiff's injury. *Id.*

### e. Causation

 To make a prima facie showing of causation, a plaintiff must show that the defendant's conduct was "more probably than not" a cause of injury. *Wagner v. Bondex Int'l, Inc.*, 368 S.W.3d 340, 350–51 (Mo. App. W.D. 2012). The plaintiff must prove (1) causation in fact (or "but for" cause) and (2) proximate causation. *Strong*, 261 S.W.3d at 506. Cause in fact is established if "the plaintiff's injury would not have occurred 'but for' the defendant's conduct." *Id.* Whether the negligent conduct was the cause in fact is a question for the jury. *Wagner*, 368 S.W.3d at 351. Proximate cause, however, is a question of law, which we review *de novo. Id.* at 353.

#### 1. Cause in Fact

 Crane's claim that there was insufficient evidence to show its conduct was the actual cause of Mr. Poage's injuries is based on three premises: (1) there is no evidence to show Mr. Poage was even exposed to a Crane product while on the *Haynsworth*; (2) Mrs. Poage failed to present evidence that its valves were defectively designed; and (3) there was insufficient evidence to show that an adequate warning would have prevented Mr. Poage's injuries. Whether Crane's conduct was the "cause in fact" of Mr. Poage's injuries is a factual question left for the jury. In Missouri, "[w]e merely instruct the jury that the defendant's conduct must 'directly cause' or 'directly contribute to cause' [a] plaintiff's injury" to establish cause in fact. *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 863 (Mo. banc 1993).

## Substantial Factor

 To establish actual causation in Missouri, the conduct of the defendant must be a "substantial factor" in causing the injury. *See id.* at 862–63. Generally, the conduct complained of is a "substantial factor" in causing an injury if the injury would not have occurred "but for" its occurrence.[4] *Id.* However, in cases where multiple independent torts are alleged to be the cause of the plaintiff's harm, "substantial factor" means that the conduct at issue would be "sufficient in and of itself to cause the injury," even if that injury would have occurred due to others' independent conduct.[5] *Id.* ("We now reiterate that the 'but for' test for causation is applicable in all cases except those involving two independent torts, either of which is sufficient in and of itself to cause the injury, i.e., the 'two fires' cases."). Nonetheless, in Missouri, "we do not use the terms 1) 'proximate cause,' 2) 'but for causation,' or 3) 'substantial factor' when instructing the jury." *Id.* at 863. Instead, we instruct the jury to determine if the defendant's conduct *directly causes* or *directly contributes* to cause a plaintiff's injury. *Id.* The "substantial factor language 'provides a standard for the trial court in the exercise of its duty to determine whether a submissible case has been made[.]' " *Wagner*, 368 S.W.3d at 356 (quoting *Hagen v. Celotex Corp.*, 816 S.W.2d 667, 673)).

 Mrs. Poage alleged that multiple companies contributed to Mr. Poage's mesothelioma. Accordingly, she must present sufficient evidence that Crane's valves were at least a "substantial factor" to submit her case to the jury. Missouri has not expressly defined how to apply the substantial factor test in asbestos cases. *Chism v. W.R. Grace & Co.*, 158 F.3d 988, 992 (8th Cir. 1998); *see also Wagner*, 368 S.W.3d at 353–54. The majority of courts apply a "frequency, regularity, and proximity" standard to determine if a defendant's conduct was a substantial factor in causing a plaintiff's injury in asbestos cases. *Chism*, 158 F.3d at 992. In applying this test, a court primarily looks at four factors: (1) exposure to a particular product; (2) the frequency of the exposure; (3) the duration of the exposure; and (4) how closely the plaintiff worked with the asbestos-containing product. *Id.* Like the Western District in *Wagner*, we decline to decide if Missouri courts should adopt the "frequency, regularity, and proximity" test used by the majority of courts. *Wagner*, 368 S.W.3d at 354. Nonetheless, common sense tells us more frequent exposure, lengthier exposure, and being in close proximity to asbestos dust will all increase the likelihood of causing mesothelioma. In the present case, the jury found Crane's valves "directly caused" or "directly contributed to case" Mr. Poage's mesothelio-

---

4. Courts sometimes discuss the substantial factor test to establish actual causation, while it is other times used for determining "proximate cause." *See Callahan*, 863 S.W.2d at 860–63 (discussing "substantial factor" analysis within the context of "but for" causation); *Cf. Loyd v. Ozark Elec. Co-op., Inc.*, 4 S.W.3d 579, 587 (Mo. App. S.D. 1999) overruled by *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 225 (Mo. banc 2003) ("When two forces are actively operating, and each is sufficient by itself to bring about injury or death, the acts of one may be held to be a substantial factor and thus the proximate cause of the

injury or death."). In both cases, the test is used to determine the same thing, and in either case, it is a question for the court to determine the submissibility of the case. However, because the "substantial factor" test is used as a replacement for the "but for" test when multiple independent causes exist, we believe the discussion is more relevant to "causation in fact" than "proximate cause." *See Callahan*, 863 S.W.2d at 862–63.

5. Mrs. Poage named 104 defendants in her petition.

ma, thus finding Crane's asbestos-laden valves were the cause in fact of his injury. Tom Thompson, another machinist on the *Haynsworth*, testified that: (1) he worked side-by-side Mr. Poage for "almost four years of [his] life" in the "40–by–40 foot [engine] room" on the *Haynsworth*; (2) he and Mr. Poage worked on every valve in the forward engine room, which included Crane valves; and (3) Mr. Poage did everything on the *Haynsworth* that he did. Accordingly, there was sufficient evidence to establish Crane's valves were a "substantial factor" in causing Mr. Poage's mesothelioma.

### *Exposure to Crane Valves*

■ Crane acknowledges that evidence was sufficient to show that the *Haynsworth* was equipped with valves that contained asbestos, however, they assert that "the record is silent" on which types of valves Mr. Poage may have encountered. We disagree. There is a substantial amount of evidence that shows Mr. Poage was exposed to asbestos-laden Crane valves during his four year tenure on the *Haynsworth*.

Mrs. Poage presented evidence that Crane sold many asbestos-containing valves and gaskets to the Navy and that such products were installed on the *Haynsworth*. Although no witness could recall a specific time they saw Mr. Poage working with relevant Crane products, Mrs. Poage adduced sufficient evidence for a reasonable jury to find Crane directly caused or directly contributed to causing Mr. Poage's injuries. As discussed in the substantial factor analysis *infra*, Thompson testified that (1) he worked side-by-side with Mr. Poage for "almost four years of [his] life in a "40–by–40 foot [engine] room" on the *Haynsworth*; (2) he worked on every valve in that engine room, including Crane valves; and (3) Mr. Poage would

have worked on Crane valves as well, because Mr. Poage did everything that Thompson did. Accordingly, the evidence contradicts Crane's assertion that there was "no evidence to show that Mr. Poage encountered asbestos-containing materials associated with a Crane valve." Given that there was sufficient evidence for a jury to find Mr. Poage was exposed to asbestos from Crane valves, there was sufficient evidence to find the exposure directly caused or contributed to his mesothelioma. The jury was presented with further evidence of the causal connection when James Strauchen, M.D., Mrs. Poage's pathology and causation expert, testified that all types of asbestos cause mesothelioma and asbestos exposure is the *only* proven cause of the disease.

We view the evidence "in the light most favorable to the jury's verdict, giving the plaintiff all reasonable inferences and disregarding all conflicting evidence and inferences." *Smith II*, 410 S.W.3d at 630. Furthermore, we will only reverse the jury's decision if "there is a complete absence of probative fact to support the jury's conclusion." *Id.* (quoting *Dhyne*, 188 S.W.3d at 457). Given Thompson's testimony and the length of time Mr. Poage worked in the engine room on the *Haynsworth*, there is sufficient evidence for a reasonable trier-of-fact to conclude Mr. Poage was "more likely than not" exposed to Crane asbestos-containing valves. *See Strong*, 261 S.W.3d at 511 ("Generally, the fact that only circumstantial evidence is presented on a material issue is no bar to recovery." However, "[t]he proof must be realistically tailored to the circumstances and the existence of a defect may be inferred from circumstantial evidence with or without the aid of expert evidence."). For the foregoing reasons, there was sufficient evidence for a jury to find Crane valves, at minimum, "directly contributed" to Mr. Poage's mesothelioma.

### Sufficiency of Evidence to Show a Design Defect Existed

 Additionally, Crane contends that Plaintiff failed to present sufficient evidence to show their valves had a design defect, because there was no evidence that using "asbestos-containing gaskets or packing" was *required* for the valves installed on the *Haynsworth*. A product is considered to have a design defect when, "a design is itself inadequate, rendering the product unreasonably dangerous without regard to whether a warning is given[.]" *Moore v. Ford Motor Co.*, 332 S.W.3d 749, 757 (Mo. banc 2011).

Crane cites *Smith I* to support its contention that when a design of a piece of equipment is compatible for use with both asbestos-containing and non-asbestos-containing components, "there is no basis for concluding that the equipment's design caused [Mr. Poage's] injury." *Smith v. Brown & Williamson Tobacco Corp.*, 275 S.W.3d 748, 792 (herein *"Smith I"*). This is unpersuasive. *Smith I* actually supports Mrs. Poage's position: "the defect is in the design given that the manufacturer had *deliberately* added or omitted the challenged component and has presumably made that decision after balancing a variety of factors." *Id.* (emphasis added). There is no dispute that Crane deliberately added asbestos-containing components to its valves before placing them in the stream of commerce. Moreover, Dr. Anthony Pantaleoni ("Dr. Pantaleoni"), the vice president of environment health and safety for Crane, acknowledged that Crane specified the use of asbestos-containing components in its valve design drawings for some valves used on the *Haynsworth*.[6] Additionally, Mrs. Poage's expert witness

in industrial hygiene, Steven Paskal ("Paskal"), testified at trial that for the valves to properly function for a "full range" of applications, asbestos-containing gaskets and packing were *required*, not merely *available*. Crane designed and sold valves that incorporated asbestos-containing components. Although the valves could be used with non-asbestos containing gaskets, doing so would limit the utility of the product. Crane even specified that asbestos-containing gaskets should be used to replace old gaskets. Accordingly, the jury had sufficient evidence to conclude the relevant Crane valves were defectively designed.

### Sufficiency of Evidence to Show Failure to Warn Was the Cause of Injury

 For a plaintiff to establish the cause of injury based on a failure to warn, he must show that a plaintiff would have heeded the warning and altered his behavior if an adequate warning existed. *Moore*, 332 S.W.3d at 762. The Supreme Court of Missouri recognized the difficulty a plaintiff would have proving he would have acted differently if the product contained a warning:

> [The plaintiff] is correct that where, as here, no warning is given, then evidence of what a person would have done had a warning been given inherently is hypothetical in character. Yet, to show causation, a plaintiff must show that the absence of a warning was the proximate cause of the injury. As a matter of logic, to accomplish this a plaintiff must show that she did not have the information the warning would have imparted already and that, if she had the informa-

6. At trial, Respondent introduced "the Navy department master parts book." Dr. Pantaleoni confirmed that the parts book was prepared to identify the proper replacement parts for Crane valves, and the valves directed users to use asbestos-containing gaskets and packing.

tion, it would have affected her conduct. This creates a 'Catch–22' in which the plaintiff must prove what she would have done had a warning been given to prove causation, but evidence on this issue must be precluded as speculative. *Id.* at 762–63.

 Missouri courts avoid this dilemma by presuming that if a product contained an adequate warning, "it would have been heeded." *Id.* at 763. Nonetheless, this presumption is rebuttable. *Id.* Crane contends that Mrs. Poage was "required to introduce evidence that the lack of a warning on the valves caused Mr. Poage's harm." However, as our Supreme Court noted in *Moore*, Missouri helps the plaintiff meet this evidentiary burden by presuming that a warning will be heeded. *Id.* at 762–63. A plaintiff is only required to show he lacked adequate knowledge of the risks associated with use of the product to receive the presumption, and this presumption "would make a prima facie case that had [the defendant] given [the plaintiff] an adequate warning, [the plaintiff] would have heeded it." *Id.* at 762.

Crane attempted to rebut this presumption by arguing that Mrs. Poage presented "no evidence that Navy would have permitted Mr. Poage to accept that warning and deviate from his Navy-directed duties and work practices." This contention is supported by Thompson's testimony that "[o]ne thing [he] learned when [he] went to the Navy was [he had to] take orders. There was no getting out of [it]." Nonetheless, we disregard all conflicting evidence and inferences. *Smith II*, 410 S.W.3d at 630. Also, the jury need not accept the testimony as true, and a reasonable jury could believe Thompson's testimony and still conclude the lack of warning caused Mr. Poage's mesothelioma. Even if Mr. Poage would have had to continue working with the asbestos gaskets per the Navy's

directions, he could have taken steps to prevent—or at least minimize—his exposure by taking precautionary measures. For example, he could have possibly worn protective gear to prevent inhalation of asbestos dust, or he could have possibly taken steps to improve ventilation.

Crane also argued that, even if they had placed an adequate warning on the valves, there was insufficient evidence to show that the warning would have reached Mr. Poage. We disagree. Thompson testified that machinists like he and Mr. Poage had onboard access to manufacturer's equipment manuals for "[e]very piece of machinery." If Crane had included a warning in the manual accompanying the valves, there is a factual basis for concluding the warning would have likely reached Mr. Poage. Although Crane's argument that the warnings would not have reached Mr. Poage is logical and may be persuasive to some jurors, on review, we will only reverse the jury's decision if "there is a complete absence of probative fact to support the jury's conclusion." *Smith II*, 410 S.W.3d at 630 (quoting *Dhyne*, 188 S.W.3d at 457). Although the jury could have concluded Mr. Poage would not have heeded any warning, it could also conclude Thompson's testimony was not persuasive enough to rebut the presumption. We find there was sufficient evidence for the jury to conclude Mr. Poage would have heeded a proper warning of the valves' unreasonable danger if Crane had included it on the product.

### 2. Proximate Cause

 Crane argues that Mrs. Poage "failed to present sufficient evidence from which a reasonable juror could conclude that an asbestos-containing gasket or packing associated with a Crane valve was the proximate cause of Mr. Poage's mesothelioma." As aforementioned, "prox-

imate cause" is a ***legal determination.*** *Wagner*, 368 S.W.3d at 353; *see also Callahan*, 863 S.W.2d at 863 (explaining that Missouri jury instructions "do not use the terms 1) 'proximate cause,' 2) 'but for causation,' or 3) 'substantial factor'...[w]e merely instruct the jury that the defendant's conduct must '*directly cause*' or '*directly contribute to cause*' plaintiff's injury") (emphasis added). Accordingly, it is the trial court's role—not the jury's function—to determine if a defendant's conduct is the "proximate cause" of the plaintiff's injuries; "[w]hile causation in fact is a question for the jury, '*[p]roximate cause is a question of law for the trial court.*' " *Wagner*, 368 S.W.3d at 354 (quoting *Payne v. City of St. Joseph*, 135 S.W.3d 444, 451 (Mo. App. W.D. 2004) (emphasis added)). Accordingly, whether there was "sufficient evidence from which a reasonable juror could conclude" Crane's valves were the proximate cause of Mr. Poage's mesothelioma is irrelevant. However, because "proximate cause" is a prerequisite for making a submissible case, we will briefly address it here. *See Smith II*, 410 S.W.3d at 630 (explaining that a plaintiff must adduce sufficient evidence to support every essential element of a claim to make a submissible case).

The general test for proximate cause is whether an injury is "a reasonable and probable consequence" of a defendant's act or omission. *Sanders v. Ahmed*, 364 S.W.3d 195, 210 (Mo. banc 2012). Effectively, even if actual causation is established, proximate cause limits a defendant's liability to injuries that are "the natural and probable consequences of a defendant's actions"; damages that are "surprising, unexpected, or freakish" cannot be recovered. *See Id.*; *see also Wagner*, 368 S.W.3d at 354. As the Western District has noted, causing a plaintiff's mesothelioma and eventual death after exposing him to asbestos for several years "is not surprising, unexpected, or freakish, nor is it an unreasonable or improbable consequence." *Wagner*, 368 S.W.3d at 354. Accordingly, Mrs. Poage presented sufficient evidence to establish that Crane's conduct was the proximate cause of Mr. Poage's injuries.

### 3. Crane's Duties to Mr. Poage

Crane contends that Mrs. Poage's evidence "failed to establish that Crane owed a duty to Mr. Poage" because they did not manufacture, sell, or otherwise place asbestos-containing products into the stream of commerce. Crane argues that it should not, and cannot, be held liable under a strict liability or negligence theory for another company's manufacturing or distribution of hazardous products. It should be noted that the question of "duty" is only relevant to Mrs. Poage's negligence claim.

Crane contends, "In Missouri, product-liability claims lie only against those entities that manufacture, sell, or otherwise place into the stream of commerce the harm-causing product," and "[t]his is true whether the action is based in strict liability or negligence." Crane also argues that under § 537.760 it is categorically immune to a products liability lawsuit because their product did not have a design defect and it was not unreasonably dangerous at the time it was transferred in the chain of commerce. *See Feiteira v. Clark Equip. Co.*, 236 S.W.3d 54, 59 (Mo. App. E.D. 2007). Furthermore, Crane asserts that it is undisputed that it did not manufacture any asbestos-containing products. Rather, Crane insists that its valves did not contain asbestos, while conceding that some materials "available for use" in conjunction with Crane valves, such as certain gaskets and packing seals, were "impregnated with asbestos fibers during the time period when

Mr. Poage served aboard the *Haynsworth.*"

. We find Crane's assertion misleading. The record shows that Crane's corporate witness, Dr. Pantaleoni, testified at trial that Crane provided the Navy with valves that used asbestos-containing gaskets and packing for use on the *Haynsworth.* Dr. Pantaleoni further testified that Crane worked with the · Navy to produce the Navy department master parts book, which identified the proper parts for replacement with their valves. Dr. Pantaleoni confirmed that the book called for asbestos-containing parts for the Crane valves used by the Navy. Moreover, Mrs. Poage's expert witness in industrial hygiene, Paskal, testified at trial that for the valves to properly function for a "full range" of applications, asbestos-containing gaskets and packing were *required,* not merely *available.* Paskal also testified that the manual Crane packaged with its valves specified the use of asbestos-containing gaskets. (*See Matter of New York City Asbestos Litig.* 27 N.Y.3d 765, 793, 37 N.Y.S.3d 723, 59 N.E.3d 458 (2016) ("[T]he manufacturer of a product has a duty to warn of the danger arising from the known and reasonably foreseeable use of its product in combination with a third-party product which, as a matter of design, mechanics or economic necessity, is necessary to enable the manufacturer's product to function as intended.").

As the seller of a valve that contained asbestos-laden gaskets and packing, and the seller of a valve that required replacement asbestos-containing gaskets and packing, Crane owed its consumers, like Mr. Poage, a duty to refrain from producing "unreasonably dangerous" products as defined in § 537.760(3). A product may inherently be "unreasonably dangerous" due to its "defective · condition" (§ 537.760(3)(a)) or characterized as "un-reasonably dangerous" due to the absence of an appropriate warning (§ 537.760(3)(b)). Accordingly, Crane owed Mr. Poage a duty to warn and a duty to produce products without a defective design that created an unreasonable danger, and there was sufficient evidence for the jury to conclude that both of those duties were breached by Crane.

### 4. Conclusion on Submissibility of the Case

To determine whether a judgment notwithstanding the verdict should have been granted, appellate courts apply "essentially the same standard" as a *de novo* review. *Ellison,* 437 S.W.3d at 768. "A motion for judgment notwithstanding the verdict should be sustained only when all of the evidence and the reasonable inferences to be drawn therefrom are so strong against the plaintiff's case that there is no room for reasonable minds to differ." *Montgomery v. Wilson,* 331 S.W.3d 332, 336 (Mo. App. W.D. 2011). In determining whether the plaintiff made a submissible case, we view the evidence in the light most favorable to the plaintiff. *Smith II,* 410 S.W.3d at 630. We will only reverse the jury's decision if "there is a complete absence of probative fact to support the jury's conclusion. *Id.* (quoting *Dhyne,* 188 S.W.3d at 457).

The record shows that Mrs. Poage presented sufficient evidence for a reasonable jury to conclude that Crane was liable under theories of both negligence and strict liability. Moreover, the record establishes that Crane owed a duty to Mr. Poage to warn, Crane defectively designed its valves in an unreasonably dangerous manner, and such conduct was the proximate cause of Mr. Poage's mesothelioma and eventual death. Based on the foregoing, Mrs. Poage made a submissible case to the jury, the jury had sufficient evi-

dence to find Crane liable under a strict liability or negligence theory, and the trial court did not err in denying Crane's motion for judgment notwithstanding the verdict. Point I denied.

## Point II: Punitive Damages

Crane contends that the trial court erred in submitting Mrs. Poage's punitive damages claim to the jury and overruling its motion for judgment notwithstanding the verdict because: (1) Mrs. Poage submitted no evidence that Crane's conduct was outrageous or done with "complete indifference to or conscious disregard for the safety of others;" (2) Mrs. Poage failed to adduce evidence demonstrating Crane knew or had reason to know that there was a high probability that gaskets and packing associated with its valves had a high probability of causing injury to Navy seamen; (3) Mrs. Poage failed to establish that an award of punitive damages to her would serve such award's intended purpose; and (4) Mrs. Poage based her claim for punitive damages, in part, on an improper request that the jury punish Crane for alleged harm caused to third-parties (non-parties to the lawsuit). Based on these contentions, Crane requests that we grant it a new trial.

### a. Standard of Review for Punitive Damages

"Whether sufficient evidence exists to support an award of punitive damages is a question of law, which we review *de novo.*" *Blanks v. Fluor Corp.*, 450 S.W.3d 308, 401 (Mo. App. E.D. 2014) (citing *Gilliland v. Missouri Athletic Club*, 273 S.W.3d 516, 520 (Mo. banc 2009)). "In reviewing the submissibility of punitive damages, we view the evidence and all reasonable inferences in the light most favorable to submissibility." *Id.* "Only evidence that tends to support the submission should be considered." *Id.*

Two prerequisites for allowing punitive damages are (1) demonstrating some element of outrageous conduct; and (2) showing the defendant acted with a "willful, wanton or malicious culpable mental state." *Id.* at 400. (citing *Burnett v. Griffith*, 769 S.W.2d 780, 789 (Mo. banc 1989). "Under both negligence and strict liability theories, the plaintiff must demonstrate that the defendant showed a complete indifference to or conscious disregard for the safety of others" to recover punitive damages. *Jone v. Coleman Corp.*, 183 S.W.3d 600, 610 (Mo. App. E.D. 2005). However, the requisite knowledge under each theory differs:

> In a negligence action, punitive damages may be awarded if the defendant *knew or had reason to know* a high degree of probability existed that the action would result in injury…To submit punitive damages to the jury in a strict liability case, a plaintiff must present evidence that the defendant placed in commerce an unreasonably dangerous product with *actual knowledge* of the product's defect.

*Letz v. Turbomeca Engine Corp.*, 975 S.W.2d 155, 164–65 (Mo. App. W.D. 1997) (emphasis added).

Additionally, a plaintiff must prove her claim for punitive damages by clear and convincing proof. *Blanks*, 450 S.W.3d at 400 (citing *Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104, 110 (Mo. banc 1996)) (explaining that punitive damages require a higher standard of proof because they are "extraordinary and harsh."). In summation:

> The circuit court must determine whether the evidence—giving full play to the jury's right to determine credibility, weigh the evidence and draw justifiable inferences of fact—is sufficient to permit a reasonable juror to conclude that the plaintiff established with convincing clar-

ity—that is, that it was highly probable—that the defendant's conduct was outrageous because of evil motive or reckless indifference.

*Peters v. Gen. Motors Corp.*, 200 S.W.3d 1, 25 (Mo. App. W.D. 2006).

 Because a plaintiff must establish outrageous conduct and a willful, wanton, or malicious culpable mental state, punitive damages are ordinarily not recoverable for negligence. *Blanks*, 450 S.W.3d at 401. By its nature, negligence is "a mere omission of a duty to exercise care [which] is the antithesis of willful or intentional conduct." *Id.* (quoting *Hoover's Dairy, Inc. v. Mid–America Dairymen, Inc. /Special Products, Inc.*, 700 S.W.2d 426, 435 (Mo. banc 1985). Nonetheless, an act or omission that is properly characterized as negligent "may manifest such reckless indifference to the rights of others that the law will imply that an injury resulting from it was intentionally inflicted." *Id.* In this context, " 'reckless' connotes an indifference to whether or not wrong or injury is done." *Blum v. Airport Terminal Servs., Inc.*, 762 S.W.2d 67, 73 (Mo. App E.D. 1988) (citing *Evans v. Illinois Central R. Co.*, 289 Mo. 493, 233 S.W. 397, 400 (Mo. banc 1921)). Additionally, a negligent act may equate to the "conscious disregard for the safety of others" if the defendant is conscious of his conduct and has knowledge that his conduct will naturally and probably result in injury, even if he lacks a specific intent to cause the injury. *Blanks*, 450 S.W.3d at 407. In other words:

> A submissible case [for punitive damages] is made [on a negligence claim] if the evidence and the inferences drawn therefrom are sufficient to permit a reasonable juror to conclude that the plaintiff established with convincing clarity—that is, it was highly probable—that the defendant's conduct was outrageous be-

cause of evil motive or reckless indifference.

*Howard v. City of Kan. City*, 332 S.W.3d 772, 788 (Mo. banc 2011). Similarly, conduct giving rise to strict liability actions will often not suffice to establish punitive damages, but similar to negligence claims, the underlying conduct can justify punitive damages. *See Racer v. Utterman*, 629 S.W.2d 387, 396 (Mo. App. E.D. 1981) (noting that degree of fault is immaterial to recovery for strict liability claims, but sufficient conduct to give rise to a claim "may run from total innocence to deliberate intention to inflict harm").

**b. Outrageous Conduct with Indifference or Conscious Disregard for the Safety of Others and Knowledge of the Product's Unreasonable Danger**

 We will address Crane's following two arguments together: (1) Mrs. Poage failed to adduce sufficient evidence that Crane knew or had reason to know that there was a "high probability" that its gaskets would cause injuries and (2) Mrs. Poage failed to adduce sufficient evidence that Crane exhibited "complete indifference to or conscious disregard for the safety of others," as the question of knowledge is pertinent to assessing Crane's alleged indifference and/or conscious disregard. *See Id.* at 396 (explaining that "a finding of fault sufficient to justify punishment is essential to recovery of [punitive] damages," and the absence of constructive or actual knowledge supports an inference that the conduct "was not indifferent to or in conscious disregard of the safety of others"); *see also Peters*, 200 S.W.3d at 25 (quoting *Hoover's Dairy, Inc.*, 700 S.W.2d at 437) ("Actual knowledge of the dangerous condition furnishes the element of reckless conduct justifying a punitive damage award.").

Regarding Crane's "knowledge," Mrs. Poage presented evidence to establish that

Crane (1) had a general knowledge of the dangers of asbestos and (2) knew there was a high probability that shipping the asbestos-laden valves would result in injury to product users.

### 1. Dr. Pantaleoni's Testimony

Mrs. Poage's counsel called Dr. Pantaleoni as a fact witness; he is the vice president of environmental health and safety for Crane. Mrs. Poage's counsel asked Dr. Pantaleoni about Dr. A.M. Harvey, who worked for Crane in the late 1890's and early 1900's. He was Crane's chief surgeon during that period. Dr. Pantaleoni testified that Dr. Harvey was the "head of [Crane's] medical department, and his responsibilities focused on worker health and safety, which included joining several professional societies and associations that dealt with worker safety, as well as monitoring the world's literature covering developments in occupational worker safety that might impact Crane's operations. Throughout Dr. Pantaleoni's testimony, Mrs. Poage's counsel produced numerous articles, and questioned Dr. Pantaleoni about Crane's knowledge of their contents. As most of the publications cover the same, or at least very similar material, we will only mentioned a few for the sake of brevity.

During direct examination, Mrs. Poage's counsel asked Dr. Pantaleoni about a document received into evidence titled "Compensation for Industrial Diseases." The document became public in 1906 and discussed the link between asbestos and lung-related diseases. Dr. Pantaleoni acknowledged that Crane was aware of the article.

Mrs. Poage's counsel also questioned Dr. Pantaleoni about a 1918 article from the Pennsylvania Medical Journal. The article discussed two preliminary reports on dust studies in various industries performed by doctors. The studies showed the smallest dust particles are the most likely to reach the lungs of workers and cause fibrosis and noted this type of dust is produced by the grinding operations of asbestos. Dr. Pantaleoni appears to acknowledge this—or at the least provides a non-denial—when asked "[W]hen you found out about this, did you do any tests to determine whether suction methods might reduce the amount of asbestos fibers someone might breathe when removing a gasket from a Crane valve?"[7]

Dr. Pantaleoni was also asked about a document published in 1927 by the British Medical Journal called "Pulmonary Asbestos." The British Medical Journal was publicly available. In the article, a doctor notes that people in the medical field had long suspected asbestos dust to be a cause of lung ailments for workers in badly ventilated factories. When asked if the article was "the kind of thing that [Dr.] Harvey was hired to monitor," Dr. Pantaleoni responded, "I believe part of his job was to stay abreast of the literature" but he could not answer whether Dr. Harvey actually received it. Mrs. Poage's counsel remarked that the information regarding the dangers of asbestos kept accumulating "one article after another," to which Dr. Pantaleoni agreed, "[t]hey say the same thing over and over."

Mrs. Poage's counsel also questioned Dr. Pantaleoni about two articles from 1933 published by the American Society of Mechanical Engineers. Both of these publications—Dust in Industry and The Control of Industrial Dust—highlighted the causal link between the inhalation of asbestos

---

7. Dr. Pantaleoni responded: "Well, no, because if you look at this document that you just gave me here, it talks about the grinding of asbestos, the milling of asbestos, those are not in our operations."

dust and lung diseases. Dr. Harvey, who was responsible for monitoring literature concerning industrial diseases, was a member of the American Society of Mechanical Engineers. Mrs. Poage's counsel continued to produce several more publications from the 1930's and 1940's that would be within Dr. Harvey's purview as the head of Crane's medical department, but Dr. Pantaleoni could not speak to which publications Dr. Harvey had actually received. Like the publications previously discussed, these articles and journals contained similar information about asbestos-related diseases and the medical community's growing awareness of the issue.

## 2. Dr. Rosner's Testimony

Dr. Rosner, a "historian" and Mrs. Poage's expert witness, testified that "from 1898 to 1920 was the period when we really established that asbestos dust was a danger in the United States," and "by 1930, it was well established...workers who [were] working with asbestos directly and also indirectly with products" that created asbestos dust were at risk of "potential danger." Moreover, he stated that as early as 1906 there was "no doubt" that asbestos caused lung fibrosis.

During Dr. Rosner's testimony, Mrs. Poage's counsel asked about several publications submitted into evidence describing developments in the medical community linking asbestos to lung problems, most of which were also referenced during Dr. Pantaleoni's testimony. Mrs. Poage's counsel produced a document titled "Pulmonary Asbestosis," a 1933 article from the Journal of Industrial Hygiene, which discussed the slow development of pulmonary asbestosis which produced "insidious" lung changes in its victims who would often be relatively free from symptoms for at least five years.

Another publication produced by Mrs. Poage's counsel was a journal from 1936 titled "Industrial Review." The journal was written by the Illinois Manufacturers Association, of which Dr. Harvey and Dr. Chivers (Crane's personnel director at the time) were members. The publication discussed the Blower Act, which was a bill proposing to create workers' compensation law, which would place a statute of limitations on claims for injuries arising from certain occupational diseases. The proposed bill would have barred workers from seeking compensation for occupational diseases unless disablement occurred within one year from the last exposure to the hazards causing the disease, unless the disease was allegedly caused by inhalation of silica dust or asbestos dust, which would extend the plaintiff's deadline to three years from the last day of exposure. Dr. Rosner explained it was "really [an] impossible law" and "very inadequate" for victims, as they "could not discover the disease" before the statute of limitations had expired. Dr. Rosner further added that Dr. Harvey and Dr. Chivers were named as members of the Occupational Diseases Committee of the association and the Illinois Industrial counsel; two groups that focused on lobbying efforts for employers in the industry. Additionally, Dr. Chivers was listed as a member of a subcommittee, which worked for several months drafting the Blower Act. When asked about the historical significance of the act, Dr. Rosner explained "industries were faced by this crisis of asbestos, and lung disease, and silicosis, and asbestosis, during the 30's" and "they were looking for ways of incorporating asbestosis and silicosis into [Illinois] workers' comp statutes" because there was "a potential great risk" of workers exposed to asbestos dust developing one of these diseases. He further opined:

> [I]ndustries throughout the country [such as Crane] participated in trying to

write these laws...[t]hey would lobby for them...[t]hey knew that asbestos...asbestosis and silicosis were going to be compensable diseases, and...they wanted to figure out ways of limiting liability. So, this just says that they understood asbestosis was a problem. *There's no way, if you're on that committee you wouldn't know*...about asbestosis and silicosis being compensable diseases."

(emphasis added).

In summation, the "Industrial Review" and Dr. Rosner's testimony about the publication was used to show Crane was a member of the association that drafted the bill, and Crane lobbied for its passing several years after information about the latency period of asbestos-related diseases began to be developed and disseminated to the public. Dr. Rosner opined that the lobbying efforts were preceded by Crane's knowledge of asbestos-related diseases' latency period and knowledge that asbestos causing compensable injuries in the work place, which would lead to litigation. Dr. Rosner added that similar lobbying efforts were a widespread trend across the country among industrial employers who sought to limit their liability in future asbestos-related claims.

Mrs. Poage's counsel continued to produce several documents further describing the developments and medical studies which were published after 1936 but before Mr. Poage's stint on the *Haynsworth* began in 1954. For example, a summary of transactions from the National Safety Congress from 1939 was produced by the National Safety Council. The foreword of the document states many members have found it beneficial to distribute copies of the publication to executives, foremen and supervisors, as it provides practical information that can be implemented in safety programs and can be used for general

reference purposes. The journal included discussions about asbestos-related dust and warned that industries should be concerned about its harmfulness. Dr. Chivers was a member of the counsel which created the document. When asked if Dr. Chivers would have received the document, Dr. Rosner replied, "[o]f course, yes."

### 3. Paskal's Testimony

In addition to providing evidence of Crane's general knowledge of the dangers of asbestos, Mrs. Poage also adduced evidence to establish Crane had knowledge that there was a "high probability" using its valves would result in injury for users of the product, such as Mr. Poage. During direct examination, Paskal testified that replacing gaskets and packing work would create asbestos dust. He further explained that replacing gaskets and scraping them by hand would expose the worker to "about a hundred thousand to a million fibers per cubic meter." Paskal also noted that the asbestos particles would linger in the air similar to cigarette smoke, which would be exacerbated by an improper ventilation system. Paskal's testimony explained replacing gaskets in Crane valves would obviously create asbestos dust. Later in the trial, Dr. Pantaleoni testified that "in most cases" asbestos-laden gaskets and packing in the valves would require replacements. Machinists like Mr. Poage would have to perform these replacements and become exposed to asbestos dust in the process.

### 4. Conclusion

Crane does not expressly admit to having actual knowledge of asbestos' danger or the probability its valves would cause injury. However, circumstantial evidence alone is not a bar to recovery, and the evidence on the record supports a conclusion that Crane had actual knowledge their

valves had a high probability of causing lung-related diseases to naval machinists. *See Strong*, 261 S.W.3d at 511; *see also Nokes v. HMS Host USA, LLC*, 353 S.W.3d 6, 14 (Mo. App. W.D. 2011) ("Because a person's knowledge is an elusive and subjective fact, circumstantial evidence is usually the only means available of proving knowledge...and a [plaintiff] may rely on circumstantial evidence to prove knowledge."). We are asked to review the evidence in the light most favorable to Mrs. Poage, while disregarding any evidence to the contrary. *Blanks*, 450 S.W.3d at 365. Based on the foregoing, we find there was sufficient evidence for Mrs. Poage to satisfy the knowledge requirements for her strict liability and negligence claims.

A finding of actual knowledge alone is not sufficient to conclude Crane's conduct was "outrageous" and/or committed with conscious disregard or indifference for the valve users' safety, but it does provide support for that conclusion. *See Racer*, 629 S.W.2d at 396–97. "Conscious disregard or complete indifference" involves situations where a person acts or fails to act while being "conscious from the knowledge of surrounding circumstances and existing conditions, that, although lacking specific intent to injure, the person's conduct or failure to act will naturally and probably result in injury[.]" *Delacroix*, 407 S.W.3d at 42 (quoting *Smith I*, 275 S.W.3d at 813). Based on the foregoing, there is sufficient evidence for a jury to conclude with clear conviction that Crane's actions giving rise to this suit were committed with conscious disregard or complete indifference.

**c. The punitive damages award served the proper purposes of deterrence and punishment.**

Unlike compensatory damages which are awarded to compensate a wronged party, punitive damages "are imposed for the purpose of punishment and deterrence." *Rodriguez*, 936 S.W.2d at 110. Essentially, punitive damages are meant to "serve the same purposes as criminal penalties." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).

Crane primarily argues that there "is simply no conduct to deter here because Crane no longer sells asbestos-containing materials." Although the fact Crane no longer sells the product at issue is relevant, we view the goal of deterrence through a wider lens: "punitive damages provides one of the most effective deterrents of future misconduct by a defendant or by others who may be similarly tempted to engage in [similar practices]."[8] *Scott v. Blue Springs Ford Sales, Inc.*, 176 S.W.3d 140, 143 (Mo. banc 2005) (overruled on other grounds by *Badahman*, 395 S.W.3d at 40) (Judge Teitelman, concurring); *see also Wolf v. Goodyear Tire & Rubber Co.*, 808 S.W.2d 868, 873 (Mo. App. W.D. 1991) (explaining punitive damages are "to punish the defendant and to protect the public by deterring the defendant and others from doing such wrong in the future").

Moreover, deterrence is only one of the two rationales for allowing punitive damages. In this case, punitive damages still promote societal interests of punishing the wrongdoer for inflicting a consumer with a deadly disease. Mesothelioma is "a very painful cancer caused by exposure to as-

**8.** *Scott* concerns businesses engaging in fraudulent business practices as defined under Missouri's Merchandising Practices Act. There is a strong parallel between "fraudulent business practices" and unreasonably danger-ous business practices in products liability actions. Both types of actions focus on protecting consumers from harmful business practices, regardless of industry.

bestos...[it] begins by attacking the pleural lining of the lungs, and the cancer eventually spreads to encase the lungs, as well as invading the diaphragm, the lining around the heart, and the muscles and ribs of the chest wall." *Goede v. Aerojet Gen. Corp.*, 143 S.W.3d 14, 16–17 (Mo. App. E.D. 2004).

Accordingly, the punitive damages in this case would support both purposes such an award is meant to promote.

### d. Punitive damages award was not based on an improper request to the jury to punish third-parties/non-parties.

▇▇▇▇▇ In Crane's final argument in support of its second point on appeal, Crane argues that the jury's punitive damages award "was based, in whole or in part, on alleged harm to persons other than Mr. Poage." A defendant's right to due process is violated when he is punished for harm to individuals or entities other than the plaintiff. *Philip Morris USA v. Williams*, 549 U.S. 346, 349, 127 S.Ct. 1057, 166 L.Ed.2d 940 (2007). Crane points to an excerpt from Mrs. Poage's closing argument to support its claim:

> Remember, it wasn't just Mr. Poage scraping these gaskets...There were thousands of people in the Navy, outside of the Navy, all around the world, scraping these asbestos gaskets breathing that dust. They never tested. They never warned. Because they just didn't care.

We disagree with Crane. Mrs. Poage's closing argument above serves a legitimate and relevant purpose: it helps support Mrs. Poage's contention that Crane's "tortious conduct" was "reprehensible" and "evinced an indifference to or a reckless disregard of the health or safety of others." *See Lewellen v. Franklin*, 441 S.W.3d 136, 146 (Mo. banc 2014) (quoting *State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 419,

123 S.Ct. 1513) (explaining that a defendant's "indifference to or a reckless disregard of the health or safety of others" makes his conduct more "reprehensible," which allows for a higher award of punitive damages without violating a defendant's due process). The closing argument illustrates reprehensibility by showing the alleged conduct was a "repeated action," not an "isolated incident." *See Lewellen*, 441 S.W.3d at 146 (citing *State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 419, 123 S.Ct. 1513) (explaining that repeated tortious conduct also increases the "reprehensibility" of tortious conduct). Mrs. Poage's closing argument was used to show Crane's mental state and support a higher award of punitive damages; it was not simply a "plea to punish Crane for injuries [to] persons other than Mr. Poage allegedly sustained."

▇▇▇▇ This is further supported by the jury instructions. Instruction No. 18 stated, "You may consider harm to others in determining whether defendant's conduct showed complete indifference to or conscious disregard for the safety of others. However, in determining the amount of any punitive damages award, you must not include damages for harm to others who are not parties to this case." Our Court presumes that the jury follows the trial court's instructions. *Brown v. Bailey*, 210 S.W.3d 397, 412 (Mo. App. E.D. 2006).

▇▇▇▇ Furthermore, Crane's argument regarding the closing argument has been waived. "To properly preserve an issue for an appeal, a timely objection must be made during trial." *Stewart v. Partamian*, 465 S.W.3d 51, 55 (Mo. banc 2015). Crane failed to make a timely objection to Mrs. Poage's closing argument at trial.

Based on the foregoing, we deny Point II.

### Point III: Remittitur

In its third point on appeal, Crane advances three arguments that the trial court erred by not remitting Mrs. Poage's punitive damages award: (1) it did not comport with principles of due process, (2) it facially exceeds fair compensation, and (3) the punitive damages award exceeds the statutory cap of § 510.265.[9]

#### a. Standard of Review for Remittitur of Punitive Damages

"Generally, the decision to award punitive damages is peculiarly committed to the jury and trial court's discretion, and the appellate court will only interfere in extreme cases." *Smith I*, 275 S.W.3d at 810 (quoting *Barnett v. La Societe Anonyme Turbomeca France*, 963 S.W.2d 639, 661 (Mo. App. W.D. 1997)). Accordingly, we review the denial of remittitur of punitive damages using an abuse of discretion standard. *Call v. Heard*, 925 S.W.2d 840, 849 (Mo. banc 1996). "For punitive damages, an abuse of discretion is established only when the size of the award is manifestly unjust, and so disproportionate to the relevant factors that it reveals improper motives or a clear absence of the honest exercise of judgment." *Martin v. Survivair Respirators, Inc.*, 298 S.W.3d 23, 35 (Mo. App. E.D. 2009).We view the evidence and all reasonable inferences therefrom in the light most favorable to the trial court's decision. *Badahman*, 395 S.W.3d at 39. Our Court does not weigh the evidence, and our inquiry is limited to determining if the jury's verdict is supported by substantial evidence. *Id.* "[W]hen the trial court approves a jury's verdict, its discretion is practically conclu-

sive." *Delacroix*, 407 S.W.3d at 36. However, we review the constitutionality of the imposition of punitive damages *de novo*. *Lewellen*, 441 S.W.3d at 145.

#### b. Due Process

"The constitutions of the United States and Missouri guarantee that no person will be deprived of 'life, liberty, or property without due process[.]'." *Id.* (quoting U.S. CONST. amend. XIV, § 1; Mo. CONST. art. I, § 10). The due process guaranteed by both constitutions "prohibits the imposition of grossly excessive or arbitrary punishment on a tortfeasor." *Id.* at 145 (quoting *State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 416, 123 S.Ct. 1513). Any award that is grossly excessive "furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 417, 123 S.Ct. 1513. Accordingly, although the determination on punitive damages is "a function left primarily for the jury," we must ensure that the award does not infringe upon a defendant's constitutional rights. *Kelly v. Bass Pro Outdoor World, LLC*, 245 S.W.3d 841, 850 (Mo. App. E.D. 2007).

To determine if a punitive damages award comports with due process, we look at three guideposts: (1) the reprehensibility of the defendant's misconduct; (2) the disparity between the harm suffered and the amount of punitive damages awarded; and (3) the difference between the punitive damages awarded in the case compared to the amount of awards awarded and penalties imposed in similar cases.[10] *Lewellen*, 441 S.W.3d at

---

**9.** All references to § 510.265 are to RSMo Supp. 2005.

**10.** Our analysis focuses solely on the first two guideposts. The third guidepost is often "inconsequential" and difficult to apply. *Brady v.*

*Curators of Univ. of Missouri*, 213 S.W.3d 101, 111 (Mo. E.D. App. 2006) ("The Southern District of this court recognized the difficulty of applying the third guidepost in certain cases."). This is especially true when the defendant's conduct "involves acts that are, in

146 (articulating the three factors established by the United States Supreme Court in *State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 418, 123 S.Ct. 1513). In weighing these three guideposts, the "reprehensibility of the conduct" is the most important consideration. *Id.* (citing *State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 419, 123 S.Ct. 1513). In determining the "reprehensibility" of the conduct, we account for several factors:

> The harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Id.* (quoting *State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 419, 123 S.Ct. 1513).

■ Using the factors described in *Lewellen* and *State Farm Mut. Auto. Ins. Co.* we find there was a significant degree of "reprehensibility" in Crane's conduct: (1) the harm was physical in nature, not just monetary; (2) the jury found that Crane had knowledge of the asbestos danger when it introduced it into the stream of commerce, which supports that Crane's exposure of users to asbestos was not "mere accident;" and (3) Crane's introduction of asbestos-laden products into the stream of commerce was done regularly—this was not a singular, isolated incident.

■ The disparity between "the harm" and "the punitive damages awarded" is difficult to measure in a wrongful death case. We generally use the amount of com-

pensatory damages awarded as a proxy for "the harm" caused by the defendant. *See Letz*, 975 S.W.2d at 179 (discussing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 582, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), where the United States Supreme Court explained the amount of compensatory damages awarded equaled "the amount of [the plaintiff's] actual harm as determined by the jury"). In the present case, the punitive damages to compensatory damages ratio equaled just under 7:1 (and approximately 12:1 using the jury's net award of compensatory damages). Whether the disparity between punitive damages and the harm caused violates due process is determined on a case-by-case basis; "[n]o rigid benchmarks or mathematical formulas exist." *Blanks*, 450 S.W.3d at 411.

■ A punitive damages award violates due process when it "furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 417, 123 S.Ct. 1513. "High-ratio punitive-damage awards are sometimes necessary in order to have a sufficient deterrent effect." *Blanks*, 450 S.W.3d at 411. Because Crane is a large corporation—generating revenues exceeding $1 billion in 1974 and $2.5 billion in 2012, 2013, and 2014—we believe a large amount of punitive damages is necessary to have a deterrent effect in this case.

■ "[E]vidence of a defendant's financial status is admissible as an indication of the amount of damages necessary to punish the defendant." *Call*, 925 S.W.2d at 849. Mrs. Poage introduced evidence to the jury that Crane is a multi-billion dollar

a civil sense, legally wrongful" but are not "akin to criminal conduct for which sanctions might be identified and compared." *Id.* As was the case in *Brady*, there are "no comparable civil penalties" for Crane's conduct. *Id.*

Accordingly, like our Court found in *Brady*, "this guidepost provides little assistance to our analysis" and "we do not find the third guidepost to be applicable in the case before us." *Id.*

corporation.[11] A much larger amount of punitive damages is required to have a deterrent effect on a multi-billion dollar corporation than a smaller business, such as a "mom and pop" store. *Cortez v. Trans Union,* LLC, 617 F.3d 688, 718 n.37 (3d Cir. 2010) ("Common sense suggests that a corner 'mom and pop' store should not be subject to the same punitive level of damages as a company worth close to a billion dollars. The latter would simply not be deterred by an award that might be large enough to put the former out of business."). Therefore, in this case, a larger punitive damages award is justified to promote Missouri's legitimate interest of deterring companies from putting unreasonably dangerous products into our State's stream of commerce.

 "Regardless of culpability, however, heavier punitive awards have been thought to be justifiable when wrongdoing is hard to detect (increasing chances of getting away with it)[.]" *Exxon Shipping Co. v. Baker,* 554 U.S. 471, 494, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008); *see also BMW,* 517 U.S. at 582, 116 S.Ct. 1589 ("A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine."). The threat of a punitive damages award needs to be great enough to dissuade a company from engaging in wrongdoing; it needs to be substantial enough to create a negative value proposition for the company. Obviously, the risk of higher punitive damages awards increases the "cost" in a company's cost-benefit analysis. Accordingly, when the threat of being caught and punished for illegitimate business practices

is lower, there is a greater justification for permitting a large punitive damages award.

In the present case, Mr. Poage suffered more than mere economic damages. Mesothelioma is a gruesome disease. Dr. Pantaleoni explained the effects it has on one's body: "[Y]ou can have your lungs compressed so you suffocate and die, it can choke off your stomach so that you starve to death or it can choke off your throat so you can't eat and you die." Moreover, detecting the disease is very difficult. Dr. Arnold Brody testified that the duration of time between an individual's exposure to asbestos until symptoms of mesothelioma occurring usually spans "20 to 80 years," but most cases involved a latency period of "30 to 50 years" or "40 to 50 years." In Mr. Poage's case, he left the Navy in 1958, and he was not diagnosed with mesothelioma until September of 2011. The time between the inhalation of the asbestos dust and its manifestation of physical symptoms makes it much more difficult to detect the "harm."

We do not find as a matter of law that the punitive damages award was "grossly excessive" and reached the point of "arbitrary deprivation of property."

### c. Fair and Reasonable Compensation

 Crane also argues that we should remit the punitive damages award because it exceeds fair and reasonable compensation. Crane filed a post-trial motion for remittitur, which was overruled by the trial court.[12] The analysis on this issue overlaps with the Due Process analysis

---

**11.** During cross-examination of Dr. Pantaleoni, Mrs. Poage's counsel introduced Crane's 10–K which showed Crane's net sales over the three years preceding the trial: $2,579,068,000 in 2012, $2,595,281,000 in 2013, and $2,924,997,000 in 2014.

**12.** The trial court implicitly overruled Crane's motion by failing to rule on it within ninety days of the date it was filed (October 14, 2015). *See* Rule 78.06 and Rule 81.05.

*supra.* Both arguments focus on an award's reasonableness and examine whether it is "excessive." *Blanks*, 450 S.W.3d at 412 n.71. However, they are different in theory. *Id.* Courts have a *mandatory* duty to reduce a verdict if it is unconstitutional and violates a defendant's due process. *Id.* Conversely, the authority to order a remittitur is *discretionary. Id.*; § 537.068. We only have the authority to remit a punitive damages award "if, after reviewing the evidence in support of the jury's verdict, the court finds that the jury's verdict is excessive because the amount of the verdict exceeds fair and reasonable compensation for plaintiff's injuries and damages." § 537.068.

"In a wrongful death case, the jury has extraordinarily wide discretion in awarding damages." *Letz*, 975 S.W.2d at 174. Similarly, a trial court is given great discretion to approve or set aside an excessive verdict. *Id.* Accordingly, in assessing a motion for remittitur, an appellate court "will interfere only when the verdict is so grossly excessive that it shocks the conscience of the court and convinces the court that both the jury and the trial court abused their discretion." *Id.* For punitive damages awards, an abuse of discretion only occurs if the jury arrives at the amount with "improper motives or a clear absence of the honest exercise of judgment." *Id.* at 174–75 (quoting *Call*, 925 S.W.2d at 849).

There is no bright-line test for determining if a punitive damages award is excessive. *Blanks*, 450 S.W.3d at 412–13. However, Missouri courts have articulated a nonexclusive list of factors that should be weighed in determining whether a trial court abused its discretion in denying remittitur:

(1) the degree of malice or outrageousness of the defendants' conduct, which has been deemed a critical factor; (2) aggravating and mitigating circumstances; (3) the defendant's financial status, as an indication of the amount of damages necessary to punish the defendant; (4) the character of both parties; (5) the injury suffered; (6) the defendant's standing or intelligence; (7) the age of the injured party; and (8) the relationship between the two parties.

*Id.* at 413. There is nothing in the list of factors that leads us to conclude the trial court's verdict was "so grossly excessive that it shocks the conscience of the court." *Letz*, 975 S.W.2d at 174. In fact, these factors support a finding that the award was reasonable: (1) as discussed, there is sufficient evidence to show Crane had knowledge of the dangerous nature of asbestos, lending support to a finding of "malice or outrageousness"; (2) the defendant's financial status as a multi-billion dollar company supports the reasonableness of a large award; and (3) "the injury suffered" was a crippling lung disease that cut Mr. Poage's life short. Consequently, we will yield to the jury's decision-making and the trial court's judicial discretion.

### d. Statutory cap

Crane argues that the jury's award of punitive damages should be vacated, or alternatively, remitted to a lower amount in accordance with § 510.265 because the actual award exceeds what is statutorily permissible. In *Mansfield v. Horner*, the Western District held that § 510.265 does not cap damages in wrongful death cases, because under § 537.090, the Missouri Legislature allows for "aggravating circumstances damages" in wrongful death suits.[13] 443 S.W.3d 627, 659–61 (Mo. App. W.D. 2014). Both parties agree that the

---

**13.** All references to § 537.090 RSMo are to RSMo. Supp. 2005.

holding in *Mansfield* allows a plaintiff to avoid the statutory cap on damages imposed by § 510.265 by seeking damages for "aggravating circumstances." *Id.* In Mrs. Poage's petition, and in her requested jury instruction that was given at the trial, she only referred to "compensatory damages" and "punitive damages," failing to mention aggravating circumstances damages.[14] Accordingly, Crane argues that *Mansfield* is facially inapplicable in this case. Crane reasons that *Mansfield* stands for the proposition that § 510.265 still limits "punitive damages" in wrongful death cases, but it is inapplicable for "aggravating circumstances damages."

■ We are faced with the question of whether form (Crane's position) or substance (Mrs. Poage's position) should control on this issue. Historically, punitive damages and aggravating circumstances damages have been used interchangeably in Missouri. *Call*, 925 S.W.2d at 849 (stating that "aggravating circumstance damages in wrongful death cases are the equivalent of punitive damages"); *see also Smith II*, 410 S.W.3d at 629 n.1 ("[The Supreme Court of Missouri] jettisoned the term aggravating circumstances damages for punitive damages...[t]herefore, to avoid confusion, this opinion refers to the wrongful death act's aggravating circumstances damages as punitive damages."); *see also Lopez v. Three Rivers Elec. Co-op., Inc.*, 26 S.W.3d 151, 160 (Mo. banc 2000) (using the same factors to determine the submissibility of punitive damages and aggravating damages). We do not believe Mrs. Poage's damages should be limited by semantics when the terminology would not have any substantive effect on the outcome of the jury's decision. The Missouri legislature codified the Wrongful

Death Act in §§ 537.080–537.100. *Mansfield*, 443 S.W.3d at 661. Section 537.090 sets forth the "factors to be considered" by the jury in actions brought under § 537.080. As part of the Wrongful Death Act, § 537.090 is a remedial statute that Missouri courts must construe liberally to promote the statute's purpose. *See Delacroix*, 407 S.W.3d at 24 ("[S]ection 537.090 is a remedial statute that must be applied to promote the object of the legislative enactment...[r]emedial statutes are construed broadly and liberally to effect the statute's plain purpose."). The Western District explored the "apparent object" of § 510.090 in *Mansfield*:

> The Wrongful Death Act has three objectives: "to provide compensation to bereaved plaintiffs for their loss, to ensure that tortfeasors pay for the consequences of their actions, and generally to deter harmful conduct which might lead to death." The last objective is the focus of section 510.090's allowance for aggravating circumstance damages: to deter harmful conduct which might lead to death. It is logical and sound that the legislature viewed conduct leading to death as worthy of more serious consequence than other conduct.

*Mansfield*, 443 S.W.3d at 661.

■ We agree with the Western District's interpretation of § 510.265: it was constructed to allow for damages exceeding the statute's cap in wrongful death cases. *See Id.* at 660–61. In fact, our Court has considered damages for "aggravating circumstances" to be subsumed within the scope of punitive damages before. *Potter v. Kley*, 411 S.W.3d 388, 391 (Mo. App. E.D. 2013). ("[T]he jury found Defendant liable for Wyatt's ***wrongful death*** and awarded Plaintiff $100,000 in compensatory dam-

---

**14.** Mrs. Poage prayed for "actual and compensatory damages" and "punitive and exemplary damages" in her petition, but the jury instructions only referred to "compensatory damages" and "punitive damages."

ages and $200,000 in additional, *punitive damages for aggravating circumstances.*") (emphasis added). Crane does not argue it was prejudiced in any manner by using the term "punitive damages" instead of "aggravating circumstances damages." In Jury Instruction No. 18, if the jury found Crane liable for punitive damages, the jury was instructed to award punitive damages equal to a sum that it believed would "serve to punish defendant for the conduct for which [the jury] found [Crane] liable for punitive damages and will serve to deter defendant and others from like conduct." Asking the jury to determine the appropriate measure of "punitive damages" had the same practical effect as asking the jury for "aggravating circumstances damages." Without further guidance from the Supreme Court of Missouri or the General Assembly, we believe we would best serve the remedial purpose of § 537.090 by including "aggravating circumstances damages" in the meaning of "punitive damages" as used in the jury instructions in this case.[15]

Based on the foregoing, we find § 510.265 is inapplicable to this wrongful death action, therefore, there is no statutory cap that limits Mrs. Poage's damages.

**Point IV: Offset for Recovery from Asbestos Trusts**

In Crane's final point on appeal, it argues Crane had a "legal right" to a reduction to the amount of Mrs. Poage's judgment under § 537.060 and common law. Based on the same injuries at issue in the present case, Mrs. Poage had previously received some recovery from settlements with joint tortfeasors before the jury's verdict. The amount of Mrs. Poage's compensatory damages ($822,250) was reduced from $1,500,000 by the aggregate amount

of money received from the joint tortfeasors ($677,750). However, Crane contends it is entitled to a larger setoff under § 537.060 that accounts for settlement amounts Mrs. Poage will recover in the future. In the alternative, even if this Court does not find Crane is entitled to a reduction under § 537.060, Crane implores our Court to grant an offset on "equitable grounds," reasoning that Mrs. Crane would receive a double recovery in contravention of Missouri law limiting a plaintiff to "only one satisfaction of the same wrong." *Moore v. Auto. Group, Inc. v. Lewis*, 362 S.W.3d 462, 468 (Mo. App. E.D. 2012).

**a. Standard of Review**

There is a disagreement between the parties about the appropriate standard of review. Crane argues we should review the trial court's denial of a motion for reduction under § 537.060 *de novo*, reasoning no disputed issues were submitted to the jury and the trial court ruled on the issue as a matter of law. Conversely, Mrs. Poage contends the trial court's ruling on a setoff was "dependent on factual determinations," requiring a more deferential review pursuant to *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). Because the issue can be resolved with undisputed facts, relying on canons of statutory interpretation and Missouri precedent, "we review the trial court's denial of a reduction under section 537.060 *de novo*." *Delacroix*, 407 S.W.3d at 37.

**b. Statutory Offset Under § 537.060**

**1. Failure to Meet Statutory Requirements**

Section 537.060 limits a defendant's right to a reduction in judgment by

---

15. However, this is not a proclamation that the terms are categorically interchangeable. As the Western District noted in *Mansfield*, "[i]t is not for [an appellate court] to sum-

marily conclude that 'aggravating circumstance awards' and 'punitive damages' are statutory synonyms." 443 S.W.3d at 661.

*"the stipulated amount of the agreement,* or in *the amount of consideration paid,* whichever is greater." (emphasis added). The expected value of *future* settlement is beyond the scope of the statute. Consequently, Crane does not have a statutory right to a setoff for future settlement amounts.

Interpreting a statute is a question of law, which we review *de novo. Nelson v. Crane,* 187 S.W.3d 868, 869 (Mo. banc 2006). "The primary rule in statutory construction is to ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider the words in their plain and ordinary meaning." *Id.* at 869–70. The most pertinent part of § 537.060 states:

> When an agreement by release, covenant not to sue or not to enforce a judgment is given in good faith to one of two or more persons liable in tort for the same injury or wrongful death, such agreement shall not discharge any of the other tort-feasors for the damage unless the terms of the agreement so provide; however such agreement shall reduce the claim *by the stipulated amount of the agreement,* or in *the amount of consideration paid,* whichever is greater. The agreement shall discharge the tort-feasor to whom it is given from all liability for contribution or noncontractual indemnity to any other tort-feasor.

*Id.* (emphasis added). Interpreting § 537.060, our Court explained a defendant's burden for having the judgment against him reduced in *Moore Auto. Group, Inc.*:

> "[I]f a plaintiff stands to recover duplicative damages for the same wrong, a defendant may plead an affirmative defense seeking to offset any judgment against it by any amounts already received by the plaintiff as compensation for that wrong...To prove a double re-

covery, a defendant must demonstrate an overlap between: (1) the injuries or damages for which a plaintiff **has received** compensation; and (2) the injuries or damages that are the subject of a plaintiff's claim against the defendant.

362 S.W.3d 462, 468 (Mo. App. E.D. 2012) (citing *Stevenson v. Aquila Foreign Qualifications Corp.,* 326 S.W.3d 920, 929–30 (Mo. App. W.D. 2010) (emphasis added)). For Crane to be entitled to a setoff, it had the burden of proving the amount of compensation Mrs. Poage *has received* or *has agreed to receive* (whichever is greater). *See* § 537.060. Our Court's stance is aligned with the Western District's. In *Wagner,* the Western District explained that "nothing in the plain language of § 537.060 can be interpreted to entitle litigating tortfeasors to a reduction in judgment from settlement agreements plaintiffs have never sought, negotiated, or reached with other joint tortfeasors." 368 S.W.3d at 358. Although Mrs. Poage has potentially "sought" settlement agreements that were not factored into the trial court's initial setoff, Crane has not produced evidence such settlement agreements exist. The existence of a settlement agreement is the lynchpin to the setoff analysis in *Wagner;* the Western District denied the defendant's request for a setoff reduction from six bankruptcy trusts because "[n]o such settlement agreement exist[ed] between [the plaintiffs] and any of the six bankruptcy trusts." *Id.* at 359. The Western District explained its holding was consistent with the "longstanding principle of Missouri tort law" that a plaintiff is free to sue any of the joint or concurrent tortfeasors he chooses and may obtain a judgment against all or any of them. *Id.* This "longstanding principle of Missouri tort law" is "restate[d]" and embodied by § 537.060. *Id.*

Crane relies on *Callahan* to support its position. *Callahan v. Cardinal Glennon Children's Hosp.*, 901 S.W.2d 270, 275–276 (Mo. App. E.D. 1995).[16] We find *Callahan* inapposite. In that case, the relevant issue presented on appeal was whether the defendant was entitled to a post-judgment reduction pursuant to § 537.060 based on a settlement agreement between the plaintiff and a joint tortfeasors. *Id.* at 274–76. Our Court found the defendant was entitled to a reduction, explaining § 537.060 grants a reduction "by the stipulated amount of the agreement[.]" *Id.* at 273. Unlike in *Callahan*, the issue in this case is not one of timing. As there is no amount stipulated here, we find *Callahan* harmonious with *Wagner* and not persuasive on the issue before us.

■■■■ For a party to be entitled to a reduction of judgment under § 537.060, it must prove (1) a settlement agreement was reached, and (2) the agreement was compensation for the same injuries underlying the judgment. Crane has failed to meet its burden here. Allowing for a reduction based on unsettled claims would be speculative and conflict with the aforementioned "longstanding principle of Missouri tort law" and the purpose of § 537.060. The plaintiff would be forced to pursue her placeholder claims to recover the total amount of the judgment, while incurring additional litigation expenses which would limit her net compensation and likely prevent her from being "made whole." Likewise, such an interpretation would restrict a plaintiff's freedom to sue and obtain judgment against all or any joint or concurrent tortfeasors. Accordingly, Crane was not entitled to a setoff pursuant to § 537.060 for potential future settlement agreements.

### 2. Equitable Reduction or Offset

■■■■ Crane also argues we should compel a setoff against the judgment to "avoid unjust enrichment" and act in accord with Missouri's "long-standing one-recovery-for-one-injury principle." Although Crane states broad well-established equitable principles, it fails to cite to any authority allowing for an equitable setoff when a related statutory setoff is also available. Statutory provisions take precedent over common law equitable maxims. *See Boland v. Saint Luke's Health Sys., Inc.*, 471 S.W.3d 703, 712 (Mo. banc 2015). Our Supreme Court has previously noted:

> Equity courts may not disregard a statutory provision, for where the Legislature has enacted a statute which governs and determines the rights of the parties under stated circumstances, equity courts equally with courts of law are bound thereby. *Equity follows the law more circumspectly in the interpretation and application of statute law than otherwise.*

*Id.* (emphasis in original). "Section 537.060 codifies a subset of the common law defense of satisfaction," and it "provides a mechanism for reducing an award of actual damages by amounts that were settled upon by other joint tortfeasors also responsible for damages and by the damaged party." *Wagner*, 368 S.W.3d at 358. The General Assembly considered common law equitable principles beholden to our State's one-recovery-for-one injury principle when it constructed § 537.060. *Stevenson*, 326 S.W.3d at 929. "[S]ection 537.060 does not alter, but rather implements the common law rule that a plaintiff is entitled to only

---

**16.** This *Callahan v. Cardinal Glennon Children's Hosp.* is a different than the previously cited case with the same parties (*Callahan v.* *Cardinal Glennon Hosp.*, 863 S.W.2d 852, 863 (Mo. banc 1993)).

one satisfaction for the same wrong." *Id.* (quoting *Walihan v. St. Louis–Clayton Orthopedic Grp., Inc.*, 849 S.W.2d 177, 180 (Mo. App. E.D. 1993)). Allowing for a set-off based on equity in this case would contravene the statute. Any reduction or setoff by Crane would need to be accomplished through § 537.060. Accordingly, we decline to address any equitable arguments for reduction or setoff.

The trial court did not err in failing to reduce the judgment by the potential future value of unsettled placeholder claims from asbestos trusts. Point IV is denied.

### III. Conclusion

Based on the foregoing, we affirm the trial court's judgment.

Sherri B. Sullivan, P.J., concurs.

Roy L. Richter, J., concurs.